## No. 5400.

### LEWIS BURTON AND WIFE vs. O. BRUGIER AND SHERIFF.

Where the succession of a deceased husband, which is wholly composed of his half of the community property, the other half of which belongs to his surviving widow, is entirely free from debts, or only owes such trifling debts as she offers to pay, the appointment of an administrator of his succession is unnecessary, and illegal. The surviving widow has the right to take possession of the whole property and exclusively administer it, as the owner of one half of it, and as the usufructuary of the other half.

The Probate Court has no authority to order a sale of the surviving wife's half of community property at the instance of an administrator of the husband's succession, illegally appointed by that court, in order to pay debts of the succession wrongfully created by the administrator.

An order of court to sell the property of the husband's succession to pay its court costs and law charges, does not authorize the sheriff to sell the widow's half of the property.

A sheriff, who without warrant of law, or order of court, ejects the rightful possessor from property, and substitutes a wrongful possessor, is liable jointly with the wrongful possessor for whatever damages the ejectment caused.

APPEAL from the Fourth District Court, parish of Orleans. *Lynch, J.* Trial by jury.

*O. N. Ogden* and *Ogden & Hill* for plaintiffs and appellees.

*James* and *Jos. Brewer* and *Alcée J. Ker* for O. Brugier, defendant.

*Hornor & Benedict* and *E. Evariste Moïse* for sheriff, appellant.

The opinion of the court on the original hearing was delivered by MANNING, C. J., and on the rehearing by SPENCER, J.

MANNING, C. J. This suit is for five thousand dollars as damages for the forcible dispossession of the plaintiffs from their dwelling, and the injury to and partial destruction of their furniture and other movables. The petition alleges that they were in the peaceable possession of several lots of ground in an outlying part of this City, and of the buildings erected thereon, when on May 10, 1873, the sheriff's deputies and Octave Brugier entered their dwelling with violence, ejected both of them from it, removed their furniture and other effects in the street, broke or destroyed portions of them, occasioned the loss of their money and jewelry, and that Brugier has ever since kept possession of the premises. Judgment was prayed against him and the sheriff jointly.

The defence of Brugier is that he purchased the property at a judicial sale, and that the acts complained of were neither participated in nor authorized by him, but that the sheriff was bound to put him in possession of the property purchased, which was done on that day. The sheriff pleads that whatever was done was merely in the performance of his official duty, and in obedience to an order of court, and that Brugier is bound to hold him harmless, whom he calls in warranty.

A jury rendered a verdict awarding two thousand dollars damages, and the defendants appeal.

Mrs. Burton was formerly the wife of Peter H. Oldis, and at his death in August 1870, remained in possession of the community property, which consisted of the lots and dwelling already mentioned, the furniture, and some other movables. Neither of the spouses, nor the community, owed any debts. The widow paid the expenses of her husband's last illness, and of his burial. They were childless, and the heirs of the husband were a surviving brother and the children of a deceased brother. The widow owned one half of the property, the whole of it being of the community of acquets, and she was the usufructuary of the other half.

Two weeks after the death of Oldis, his surviving brother applied for and obtained letters of administration upon his estate, and the property was appraised at twenty-one hundred and sixty-eight dollars, of which two thousand dollars was the appraisement of the lots and buildings. Five weeks thereafter, the administrator represented to the court that it was necessary to sell the movable and immovable property of the deceased to pay the funeral and law charges, and the order of sale was made. On 10th. of October of same year, the widow applied for a hearing, and at her instance the order was rescinded, and on the 14th. she shewed for cause why the property should not be sold, that there were no debts of the deceased or of his succession, one only excepted, and that was due herself for paraphernal funds used by her husband—that there was no legal cause for burthening her and the suc-

cession with the costs of an administration—and after declaring her acceptance of the community pure and simple, prayed that, if the court considered there were any legitimate claims against the succession, that she be allowed to pay them, which she was ready and willing to do.

Confronted by this answer, the trial of the rule to shew cause why the property should not be sold was postponed indefinitely by consent of counsel of the administrator. This was in 1870.

On the 8th. of February 1871, the administrator presents to the court what he calls the final account of his administration, and prays publication of the notice of its filing. He does not pray for its homologation. Upon one side of this so-called account is the sum total of the inventory. Upon the other is the sum paid by the widow for the burial of her husband, and there stated to have been paid by her—eight dollars for priest and graveyard—and then follow the fees of clerk, sheriff, notary, appraiser, lawyer, and administrator. Nothing else appears on it.

On the twenty-fifth of same month, the court homologated the account, and in March the administrator, alleging that part of the funeral and all of the law charges on the account were due and owing, and there were no funds to pay them with, and that it was necessary that sufficient property should be sold to pay them, obtained an order that the widow should shew cause why she should not advance the funds as usufructuary that were needed to pay these charges, or in default of payment, why sufficient property should not be sold to pay them. This paper is filed in the same suit wherein already lay the widow's prayer for permission to pay whatever charges the court thought were legitimate, filed the previous October. The widow made no appearance, and the rule was made absolute on 26th. of April. All this took place before our learned brother, who now presides over the Second Court, occupied that bench.

A writ of *fieri facias* issued on 2nd of May—an anomalous and extraordinary writ with which to sell the property of a succession—under the following instructions;—"Meinert Oldis adm. asks for *fi. fa.* vs. Johanna Oldis widow in community and usufructuary of Peter H. Oldis. Sheriff will seize six lots of ground specified in the inventory." The sheriff did seize, and even recorded his seizure, and proceeded no further under it.

On the 25th. of May 1871, the administrator presented a second petition, praying the sale of the movables and so much of the immovables as were necessary to pay the charges on his account, and an order of sale was then made. Nothing appears.to have been done under it then. It slept nearly two years.

It would have been well for all parties if its repose had never been

disturbed. The papers presented to the court by the administrator himself shewed on their face the truth of the widow's allegation that there was no need of an administration. A solitary charge of eight dollars is all that could be pretended to be legitimate against the succession, and the widow had in the same judicial proceeding in which that charge is made, offered to pay it. She was the undoubted owner of one half of the property, the sale of which was prayed, and her usufruct of the residue had not terminated. She married her present husband a year after the date of the order.

In March 1873 the administrator applied for a new appraisement of the immovable property, which was accordingly made at one thousand dollars, and on 14th. of that month the sheriff advertised its sale under the order of May 25th. 1871. No movables were advertised for sale. The return of the sheriff was not made until March 18, 1874, in which he recites that he did advertise the sale of the movables for 27th. June 1871 on which day at five P. M. he went to the premises for the purpose of making the sale, and found the doors locked and no one there, and that subsequently, i. e. nearly two years thereafter, he advertised the realty for sale, and failing to obtain bidders, re-advertised it and on April 12, 1873 adjudicated it to Arthur Brugier at a bid of three hundred dollars on twelve months credit, but that the purchaser paid cash. A deed of the sheriff, purporting to have been made on the day of sale, recites that the bid was made by Arthur for Octave Brugier, and the conveyance is to the latter.

On the 10th. of the following month, the deputies of the sheriff came to the plaintiff's dwelling between five and six o'clock in the evening, accompanied by two policemen, and had all their furniture moved in the street. Arthur Brugier was present, and Octave was half a block off under a shed waiting the completion of the work. The plaintiffs were turned out of doors, and the keys delivered to Octave Brugier, who has retained them ever since. Burton and his wife remained in the street all night watching their furniture, and on the next morning rented a house, and moved their effects in it, where they have since remained.

It did not require the eloquent ardor of the youthful advocate who presented the case for the plaintiffs to us in oral argument with such felicity of diction, to impress us profoundly with the injuries inflicted upon his clients. It will require an exhibition of abundant warrant of the defendants in law to protect them from liability for the acts which have entailed such serious consequences upon the plaintiffs.

It is said by the counsel for the sheriff that upon the husband's death, it became necessary that the community should be liquidated by the probate court, and the residuum equally divided between the heirs

of the husband and the surviving wife—that the wife could not prevent this action of the court—that it was not only legal and proper, but it was the duty of the administrator to cause the property to be sold in order that the rights of the heirs might be liquidated.

This is true only of those successions where debts are to be paid. The succession of Oldis owed no debts, nor did the community of acquets owe any. Upon his death, his heirs become *eo instanti* seized of his moiety of the community property, subject to the surviving wife's right of usufruct. There were no creditors to be represented by an administrator. There was no residuum to be ascertained, for there was nothing to be deducted from the mass of the succession. The administrator, as such, instead of protecting the property from unjust claims, was creating and fostering them. The only ground upon which an administration could be legally demanded was that there were debts to be paid. He finds none, hears of none—asks for an administration, and afterwards creates the debts, whose prior existence was essential to the legality of his own appointment.

The appointment of an administrator is not a matter of course. Our succession system differs from that of the common law in strongly marked contrasts. In that, the heir has nothing to do with the personalty. An administrator must be appointed. In ours, the heirs may take possession both of realty and personalty, and if of age, may divide both among themselves without the appointment of an administrator, or the intervention of the probate court. If there are creditors, they may require an inventory and security, and if the security be not furnished, they may have an administrator appointed. Succession of Ducloslange, 1 Annual, 181. Civil Code, art. 1005 new no. 1011. Story's Suc. 3 Annual, 502.

When it is the succession of a deceased husband or wife, and the only property is community, and there are no creditors, the case is stronger. The surviving spouse has an absolute right to the possession of the property—of one half as owner, of the other as usufructuary— and an administrator can not be appointed. Pratt's Succession, XI Annual, 201. 12 Annual, 457. In this last case it was held, that where no creditor is shewn to desire an administration, the widow offering to pay or assume the debts which are small, and the property is community, no administration will be allowed. In the present case the deceased owed nothing, and the widow had paid all the legitimate claims against his succession, unless the charge of eight dollars for "priest and graveyard" may be excepted, and had offered to pay all others that the court should deem legitimate. It is urged that she should have answered the rule to shew cause why property should not be sold after the so-called account was filed. She had answered a rule of the same

Burton and Wife vs. Brugier and Sheriff.

party, taken in the same case, to sell the same property for the same purpose, and had put on record then and there her offer of payment and assumption of all the debts. The court was without authority to order a sale upon such a record. Burns v. Van Loan, 29 Annual, 560.

Put the case in the most favorable light for the defendants. The order directed the sale of the succession property of Oldis. It is true the administration of the succession of a deceased husband involves with it the administration of the community, and the administrator may rightfully cause the community property to be sold for the purpose of paying the debts of the succession. Suc. of McLean, 12 Annual, 222. But that is where there are debts. In this case nothing could be sold under the order but Oldis' half of the property. The widow was absolute owner of the other half, and her ownership was not divested by the sale. She was ejected from her own property without any effort on the part of the purchaser of the husband's half to obtain a partition, and the very movables which were first amenable to the payment of the succession debts were removed from the premises before the eyes of the purchaser by the officers who put him in possession. A feeble attempt is made to account for the failure to sell the movables. The officers who could get possession of the movables on the evening of the 10th of May, for the purpose of putting them in the street, need not have offered the same violence to have obtained possession of them before when they were wanted, and the display of a tithe of their determination to do their duty then would have accomplished their purposes.

Brugier urges in his defence that he had nothing to do with all this. He tells his story with a *naiveté* which deserves transcription. " I was half a block from there. They sent for me but I would not go any nearer, because whenever I went near there she (Mrs. Burton) commenced talking to me and crying out. * . * * I told him (his brother Arthur) to see the sheriff when it was about time to deliver the house, so he went to see the sheriff. The sheriff told him the day before, ' to-morrow evening you will get it.' Then the next day when my brother came home he said to me, ' this evening you will get it.' " He stood under a shed with his face turned to the house, and saw all that was done. His cupidity mastered his sensibility. The spectacle of the forlorn woman, sitting as it were within the shadow of her own roof, but forbidden to enjoy its shelter through his instrumentality, did not prevent his receiving the key which fastened the door against her entrance, and he went to his home undisturbed by the knowledge that she was to pass the night, a weary watcher over the scanty furniture which, though inexpensive, had been sufficient for her simple wants.

Much less provocation has unhappily in other instances been the

cause of bloodshed. We may encourage the peaceable submission to outrage by shewing that the law vindicates the object of it, and punishes the perpetrator.

The judgment of the lower court is affirmed.

---

## On Application for Rehearing.

SPENCER, J. Oldis died in August, 1870, in community with his wife, the plaintiff. Neither Oldis nor the community owed a dollar at his death. All the property was community. Two weeks after the death of Oldis his brother was appointed administrator of *his estate.* A few weeks later he applied for an order to sell property to pay the *funeral and law charges* of the succession. The widow came into court on tenth October, 1870, and represented that she had accepted the community, and that there were no·debts, and no need of an administration, offering to pay any legitimate claim against the succession, of whose property she was usufructuary.

In February, 1871, the administrator filed his account which, *upon its face,* shows that there was not one cent of indebtedness against Oldis or the community at his death. The widow had expressly accepted the community on tenth October, 1870. She thereby became the absolute and unqualified owner of one half of the property. There being no debts of the community, no demands against it in favor of any body, the administration of the husband's estate did not and could not embrace her half of the property. Her half of the property could not be sold to pay the funeral and law charges due by the estate of her deceased husband. They were not charges against the community. The order of the court of twenty-fifth May, 1871, directing the sale of "sufficient property of said succession" to pay said funeral and law charges, can not, *in law or fact,* be construed as embracing the widow's half of said property. If the sheriff undertook to sell her interest in said property under said order, he transcended *its terms* as well *as the law.* But it seems that he *did advertise* the whole of the property in question, and adjudicated it to the defendant, Brugier, on twelfth April, 1873. By his deed of same date, however, he sells "all the rights and titles which the said succession had in or to the said property," etc. At most the husband's half of said property passed by said sale. ·

After making this deed, the next step was an order, of date May 10, 1873, from "J. F. Dicks, deputy sheriff," to "Charles Moret, deputy sheriff," instructing him "to eject the occupant of the premises sold in succession of Oldis, and place purchaser, Mr. O. Brugier, in full possession of the place; should it become necessary to break down doors, bar-

riers, or any kind of obstacles to execute your writ, or *this order*, do so; and if any one disturbs you, have them arrested," etc.

We consider this a very high-handed and lawless proceeding on the part of the sheriff. In selling succession property under an order of sale the sheriff has no other or different powers than the administrator or any auctioneer would have in doing the same thing; he only acts in the capacity of auctioneer. The law never contemplated or authorized that a sheriff or administrator or auctioneer, in selling succession property should seize it, as is done under a writ of *fieri facias*. In fact, in this case the sheriff's return shows that he did not pretend to have seized before making the sale. What right had he then, *a month after he had made the sale and deed*, to direct his deputies, *without any order of court to that effect*, to put the purchaser into possession by force of arms, "by breaking down doors," etc.? A moment's reflection would have convinced any body that such a proceeding is lawless. I am the owner of a house and lot in New Orleans which has been (perhaps unknown to me) inventoried as part of somebody's succession. An order for its sale is obtained in a proceeding to which I am no party. It is advertised and sold without disturbing my possession. The sheriff or the administrator or the auctioneer, as the case may be, comes with his posse and ejects me from the premises ; and I wake up to find my property sold and myself and family turned out of doors, without warning or hearing. Such is not the law. The authorities referred to relative to the liabilities of sheriffs in execution of writs are all well recognized and known, but they have no application to a case like this, for neither the order of the court nor the law directed or permitted any such proceeding. As to Brugier, it is a full answer to him to say that he did and could only acquire, if any thing, title to Oldis's half, which by no means justified his taking forcible possession of the whole property.

In the application for rehearing on the part of the sheriff it is stated that "the sheriff, to whom the order of sale was directed, became *functus officio* before its execution." We do not understand what the counsel mean by this statement. If they mean that Wm. P. Harper, the sheriff sued, was *functus officio*, and therefore not liable for this lawless trespass, it is strange that he makes no such defense in his answer, which was filed twentieth June, 1873, a month after this suit was brought. He is the sheriff who signed the deed, and there is nothing to show that he was *functus officio* at the time his deputies invaded the plaintiff's premises. In our former opinion we affirmed a judgment condemning the defendants to pay damages as trespassers. We have carefully reviewed this record. That judgment meets our approval. The rehearing is refused.