UNITED STATES v. BRADFORD et al.

(Circuit Court, E. D. Louisiana. December 23, 1905.)

No. 2,413.

1. CRIMINAL LAW—LIMITATIONS—CONSPIRACY.

An overt act being necessary to sustain a prosecution for conspiracy to defraud the United States, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], the statute of limitations does not begin to run against such a prosecution until the commission of an overt act; and since every such overt act is a renewal of the conspiracy, a prosecution may be instituted within three years after the commission of any overt act, although more than that length of time may have elapsed since the conspiracy was first formed or the first of such acts was committed thereunder.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 275.]

2. CONSPIRACY—INDICTMENT.

Averments in an indictment for conspiracy, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], that defendants conspired to fraudulently obtain the issuance by the United States of land scrip in satisfaction of a confirmed private land claim, which scrip when issued could be located on public lands of the United States, and that such conspiracy was carried out by fraudulently procuring the appointment of an administrator of the succession of the true claimant, on whose application the scrip was issued, and by whom it was sold, and the proceeds converted by defendants to their own use, are sufficient to sustain the charge that the conspiracy was one to defraud the United States.

3. SAME—CONSPIRACY TO DEFRAUD UNITED STATES—ELEMENTS OF OFFENSE.

To constitute a conspiracy to defraud the United States, within Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], it is not necessary that there should have been a purpose to defraud the United States of a thing of pecuniary value, or that the conspiracy should have been successful, or that the conspirators received pecuniary advantage therefrom.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 35, 39, 41.]

4. SAME—INDICTMENT.

Where an indictment, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], charged that defendants conspired to defraud the United States by unlawfully and fraudulently procuring the issuance of, and converting to their own use, certain land scrip, and that to effect the objects of the conspiracy they "unlawfully, knowingly, falsely, and fraudulently" applied for and procured the appointment of a pretended administrator of the succession of a person to whom a private land claim had been confirmed, on whose application the scrip was issued, it was not necessary that the government should prove that defendants had actual knowledge of the true facts in relation to the succession, knowledge or that the allegations made in their petition for the appointment of the administrator were false; but it is sufficient if defendants had no knowledge of their truth, or reason to believe them to be true, and they were in fact false. This is true although the indictment avers actual

knowledge, such an averment being surplusage, and one which need not be proved.

5. Judgment—Collateral Attack—Criminal Prosecution.

A prosecution for conspiracy to defraud the United States, averred to have been effected in part by procuring the appointment of an administrator by a state court which was without jurisdiction, is not a collateral attack upon the judgment of such court; nor, even if so, would such judgment be a bar to the prosecution, since a collateral attack may be made in a criminal case when its purpose is to punish a crime committed by means of the decree, judgment, or record attacked.

## Indictment for Conspiracy to Defraud.

On February 26, 1904, the grand jury found and returned into court an indictment against James L. Bradford, William H. Wright, George Baldey, and Francis Lowry, Jr. The indictment contained three counts. The first count charges, among other things, that the four defendants, "on the ninth day of August, A. D., one thousand nine hundred and two, in the Eastern District of Louisiana, * * * did unlawfully, knowingly, willfully, and feloniously conspire, combine, and confederate and agree together and among themselves to defraud the United States of certain certificates of location, otherwise known as land scrip, of the value of five thousand dollars, and of the title and possession of public lands of the United States and within the United States of great value, to wit, five thousand dollars, upon which said scrip could by law be located, by unlawfully and fraudulently procuring and converting to their own use and benefit certain certificates of location, otherwise known as land scrip, of the United States, provided and to be issued in and by virtue of the provisions of a certain act of Congress of the United States approved June second, one thousand eight hundred and fifty-eight [here setting out the title of the act], which certificates of location, otherwise known as land scrip, were to be issued in satisfaction of the following described land claims of one William Miller, namely [here setting out the land claims], which said private land claims were the property of the said William Miller, who died in the year one thousand eight hundred and forty-five, and after his said death were the property of his heirs and legal representatives residing beyond the limits of the state of Louisiana, and which said certificates of location, otherwise known as land scrip, when issued in satisfaction of said claims, would also be, and were, the property of the said heirs and legal representatives of the said William Miller; that thereafter, to wit, on the ninth day of August, A. D., one thousand nine hundred and two, in the city of New Orleans * * * to effect the object of said conspiracy, combination, and confederation and agreement, the said [here naming the defendants] did unlawfully, knowingly, feloniously, and fraudulently apply in the name of one John C. McCants, a person unlawfully interposed by and on behalf of the said [here naming defendants], as the pretended administrator of the succession of the said William Miller, deceased, to and receive of and from the United States Surveyor General of the District of Louisiana at New Orleans five of said certain certificates of location, otherwise known as land scrip, issued under said act of Congress of June 2, 1858 (11 Stat. 294, c. 81), and described particularly as follows [here describing the certificates]; that thereupon and thereafter said [here naming the defendants] falsely and fraudulently caused said certificates of location, otherwise known as land scrip, to be illegally sold at private sale by said pretended administrator, John C. McCants, the person unlawfully interposed for their benefit, as aforesaid, and received the proceeds thereof, and converted them to their own use; that thereafter the said certificates of location, otherwise known as land scrip, were located on the public lands of the United States, and the United States was deprived and defrauded of the title and possession of said public lands, and especially of the following described public lands in the New Orleans land district of Louisiana, to wit [here describing the lands], and the United States was also left exposed to claims in said premises for said certificates of location, otherwise known as land scrip, or their value, by the heirs and legal representatives of said William Miller, deceased, the facts in reference to the said pretended admin-

istration of the succession of said William Miller being, and well known to the said [here naming the defendants] to be, that said William Miller left the state of Louisiana in the year one thousand eight hundred and twenty-five, and never thereafter resided in said state; that he died in the year one thousand eight hundred and forty-five in the city of Cincinnati, state of Ohio, where he resided at the time of his death; that his succession was opened in said city of Cincinnati, and his last will and testament, which he had left, was duly probated there, and his heirs and legatees put in possession and his succession closed; that he left no property and no debts in the state of Louisiana, and his succession owed no debts, taxes, local assessments, or charges of any kind in the state of Louisiana, and yet, on the eleventh day of March, A. D., one thousand eight hundred and ninety-eight, the said [here naming the defendants] did apply to the honorable the Sixteenth Judicial District Court for the parish of Washington, state of Louisiana, in the name, of said John C. McCants, a person unlawfully interposed for their benefit, for letters of administration on the estate of said William Miller, deceased, and for the appointment of an attorney for absent heirs, and for an appraisement and inventory, falsely and fraudulently alleging and causing it to be alleged in said application that the said William Miller was domiciled and died in said parish of Washington, state of Louisiana, and that his succession was largely in debt, and owed state, parish, and municipal taxes and local assessments and charges; that in said proceedings the said [here naming the defendants] caused the said claims of said William Miller for certificates of location, otherwise known as land scrip, under said act of Congress (chapter 81) aforesaid, of the public acts of Congress of eighteen hundred and fifty-eight, approved June 2, 1858, to be falsely appraised, in all at $78, when in truth and in fact the said certificates of location, otherwise known as land scrip, were well worth at that time the sum of fourteen hundred dollars—contrary to the form of the statute, etc."

The second count is framed substantially on the same lines as count 1. It charges a conspiracy by and between the defendants on the 20th day of April, A. D. 1903, with regard to certain certificates of location, which were to be issued in satisfaction of a certain private land claim of one Maria Taurus, deceased. The count charges that on the 20th of April, A. D. 1903, to effect the object of the conspiracy, the defendants "did unlawfully, knowingly, falsely, and fraudulently apply in the name of John C. McCants, as the pretended administrator of the succession of Maria Taurus, to, and receive of and from, the United States Surveyor General of the District of Louisiana fourteen certificates of location, which they falsely and fraudulently caused to be illegally sold at private sale by the pretended administrator, and received the proceeds thereof, and converted them to their own use, etc. That thereafter the said certificates were located on public lands of the United States." The count goes on to charge: "The facts with reference to the said pretended administration of the succession of the said Maria Taurus being, and well known to the said [here naming the defendants] to be, that said Maria Taurus did not die in the parish of Washington, state of Louisiana; that she was never domiciled therein, and that her succession owed no debts, taxes, local assessments, and charges of any kind in said parish of Washington, and yet, on the eleventh day of March, A. D. one thousand eight hundred and ninety-eight, the said [here naming the defendants] did apply to the honorable the Sixteenth Judicial District Court for the parish of Washington, state of Louisiana, in the name of said John C. McCants, a person unlawfully interposed for their benefit, for letters of administration on the estate of said Maria Taurus, deceased, and for the appointment of an attorney for absent heirs and for an appraisement and inventory, falsely and fraudulently alleging, and causing it to be alleged in said application, that the said Maria Taurus was domiciled and died in said parish of Washington, state of Louisiana, and that her succession was largely in debt, and owed state, parish, and municipal taxes and local assessments and charges; that in said proceedings the said [here naming the defendants] caused the said claim of said Maria Taurus for certificates of location, otherwise known as land scrip, under said act of Congress (chapter 81, etc.), aforesaid, of the public acts of Congress of 1858, approved June 2, 1858, to be falsely appraised in all at thirty-two dollars, when in truth and in

fact the said certificates of location, otherwise known as land scrip, were well worth the sum of $640—contrary to the form of the statute," etc.

The third count is framed substantially on the same lines as counts 1 and 2. It charges a conspiracy by and between defendants on the 9th day of November, A. D. 1901, with regard to certain certificates of location which were to be issued in satisfaction of a certain private land claim of one Charles Smith, deceased. The count charges that on the 9th day of November, A. D. 1901, to effect the objects of the conspiracy, the defendants did "unlawfully, knowingly, falsely, and fraudulently apply in the name of one John C. McCants, * * * as the pretended administrator of the succession of said Charles Smith, deceased, to and receive of and from the United States Surveyor General of the District of Louisiana, at New Orleans, two of said certificates of location; * * * that thereupon and thereafter the said [here naming the defendants] falsely and fraudulently caused the said certificates of location * * * to be illegally sold at private sale by said pretended administrator, * * * and received the proceeds thereof, and converted them to their own use; that thereafter the said certificates of location * * * were located on public lands of the United States," etc. The count further charges that "the facts with reference to the said pretended administration of the succession of the said Charles Smith being, that on the eleventh day of March, A. D. one thousand eight hundred and ninety-eight, the said [here naming the defendants] did apply to the honorable the Sixteenth Judicial District Court for the parish of Washington, state of Louisiana, in the name of said John C. McCants, a person unlawfully interposed for their benefit, for letters of administration on the estate of said Charles Smith, deceased, and for the appointment of an attorney for absent heirs, and for an appraisement and inventory, falsely and fraudulently alleging and causing it to be alleged in said application that the said Charles Smith was domiciled and died in the said parish of Washington, state of Louisiana, and that his succession was largely in debt, and owed state, parish, and municipal taxes and local assessments and charges; that in said proceedings the said [naming defendants] caused the said claims of Charles Smith for certificates of location, otherwise known as land scrip, under said act of Congress (chapter 81), aforesaid, of the public acts of Congress, approved June 2, 1858, to be falsely appraised, in all at thirty-eight dollars, when in truth and in fact the said certificates of location * * * were then well worth the sum of six hundred dollars, and whereas in truth and in fact, as said [here naming defendants] then and there well knew, the said Charles Smith did not die in the parish of Washington, state of Louisiana; that he was not domiciled there, and that his succession owed no debts, taxes, or local assessments and charges of any kind in said parish of Washington, state of Louisiana—contrary to the form of the statute," etc.

The defendants Bradford, Wright, and Baldey having been tried together and, at the same time, the defendants Bradford and Wright were found guilty on counts one, two, and three, and the defendant Baldey was acquitted. The defendants Bradford and Wright, having been sentenced, sued out a writ of error to the Circuit Court of Appeals, and the trial judge annexed to the bill of exceptions his reasons for the action complained of in the bill.

W. W. Howe, U. S. Atty., and Rufus E. Foster, Asst. U. S. Atty. Farrar, Jonas & Kruttschnitt, for defendant James L. Bradford. Frank L. Richardson, for defendant William H. Wright. Walter H. Rogers, for defendant George Baldey.

PARLANGE, District Judge (after stating the facts). In my opinion, the only important questions raised on behalf of the defendants and reserved by their bills of exception are: (A) Is this criminal action barred by the statute of limitations? (B) Does the indictment set out and the proof show that the conspiracy was for the purpose of defrauding the United States, within the intendment of Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676]? (C) Was the government required to make affirma-

tive proof beyond a reasonable doubt of the actual knowledge of defendants with regard to the facts in the successions, as averred in the indictment, and was the court's charge on that point correct? (D) Does this case involve a collateral attack on the appointment of the administrator in the successions, which attack the government was debarred from making?

A. The statute of limitations. At common law, the conspiracy alone constitutes the offense, without any overt act, and the conspirators can be prosecuted from the instant the conspiracy is formed. But under Rev. St. § 5440, no conspiracy can be prosecuted until an overt act is committed. I am fully aware of the statements found in the decisions to the effect that under Rev. St. § 5440, the gist of the offense is the conspiracy, and that the overt act is no part of the offense. Mr. Justice Woods so stated in United States v. Britton, 108 U. S., at page 204, 2 Sup. Ct., at page 534, 27 L. Ed. 698. It may be interesting to notice, in passing, that it seems the same learned jurist had previously held the reverse in United States v. Dennee, 3 Woods, at page 50, Fed. Cas. No. 14,948. But those statements have never been made with regard to or as affecting the question of the statute of limitations here presented. I agree fully that the overt act is not an element of the offense in the sense in which, in criminal law, a specific criminal intent, for instance, is an ingredient of an offense. Such ingredients are, as I believe, always culpable per se; whereas the overt act may be per se, and, considered independently of the conspiracy, a perfectly innocent act. But the indisputable fact remains that an offense under Rev. St. § 5440, cannot be prosecuted until an overt act is committed. A criminal offense against the sovereign, which he cannot prosecute and punish, is, it seems to me, a matter which the legal mind cannot grasp. It is plain, then, that the statute of limitations is not set in motion by the forming of the conspiracy, but that the moment the conspiracy is formed, and an overt act is committed by one of the conspirators to effect the purpose of the conspiracy, that moment the offense can be prosecuted, and the statute of limitations begins to run as regards that conspiracy and that particular overt act. But I am absolutely unable to agree that if, after committing the first overt act, the conspirators do nothing more for three years, and they are not prosecuted within that time, they can thereafter continue the conspiracy, or renew it either publicly or secretly and as often as they please, and that they can commit as many acts as they choose to effect the object of the conspiracy, and yet have absolute immunity from prosecution for the conspiracy. It is well settled, as I have already said, that the overt act need not itself be an offense. It might therefore be absolutely noncriminal per se, and, being such, it could not attract the attention or arouse the suspicion of the government. That immunity from prosecution for the conspiracy would result from the lapse of three years after the commission of the first overt act, although the conspiracy were thereafter continued or repeatedly renewed, and many other overt acts committed under it, is, to my mind, an utterly irrational conclusion, which the law could never have contemplated.

It was said during the trial that my view would lead to the conclusion that for the same offense persons might be subjected to many prosecutions. But this is entirely incorrect. While the conspiracy per se might be the same, yet if the conspirators chose to renew it, or to continue it in existence, and to commit new overt acts to carry it out, the conditions under which the right of the government to prosecute would arise, would be different every time a new overt act was committed. If, under such circumstances, the conspirators are subjected, so far as the statute of limitations is concerned, to a prosecution every time they commit an overt act, that result is not brought about by any act of the prosecution in splitting up a continuous offense, as was attempted to be done in Re Snow, 120 U. S. 281, 7 Sup. Ct. 556, 30 L. Ed. 658, a prosecution for unlawful cohabitation with several wives, or by tolling the statute of limitations; but the result flows directly and exclusively from the acts of the conspirators themselves. It might be said of their complaint, as was said by the Supreme Court of Vermont, quoted by the Supreme Court of the United States in O'Neill v. Vermont, 144 U. S., at page 331, 12 Sup. Ct., at page 696, 36 L. Ed. 450 (a prosecution for unlawful selling of liquor, in which the defendant was convicted of 307 offenses, and sentenced, in the aggregate, to a fine of $6,638.72 and to imprisonment for more than 55 years) that the result is brought about, not by the law, nor by any interpretation of it, nor by any act of the prosecution, but solely by the fact that the complaining defendants committed too great a number of offenses. Obviously, if the defendants had been charged with numerous different conspiracies, completed, as regards the ability of the government to prosecute, by the commission of many different overt acts, they would not be heard to complain of a situation brought about entirely by their own criminal acts, and which subjected them to many prosecutions. What difference, so far as regards the statute of limitations, is there in principle between the condition just stated and the proposition that there may be as many prosecutions as there are overt acts, when the same conspiracy is renewed as each different overt act is committed? The conspiracy C, plus overt act A, create a criminal condition for which the government can prosecute under the terms of Rev. St. § 5440, during three years from the date of overt act A. The same conspiracy C, or any other conspiracy, plus overt act B, create another and a different criminal condition, for which the government can prosecute during three years from the date of overt act B. And so on. No court has ever held that under Rev. St. § 5440, the statute of limitations begins to run from the original formation of the conspiracy, and before the commission of any overt act. As I have said before, it is inconceivable to me that the statute of limitations should begin to run before the government could prosecute. The difference of opinion is: (1) Whether the statute of limitations begins to run from the commission of the first overt act, regardless of any subsequent overt acts? Or (2) whether a prosecution begun within three years of any overt act, committed to effect the purpose of a conspiracy then in existence and in full operation, is maintainable. The first view has been upheld by Judge Deady, The Dorris Eckhoff (D. C.) 32 Fed. 556, and Judge Bunn, Northwestern Mut.

Life Ins. Co. v. Cotton Exchange Real Estate Co. (C. C.) 70 Fed. 159, for whose opinions I have the greatest respect, but with whom I am entirely unable to agree. The extraordinary result of such a doctrine I have already referred to. The second view, which in my opinion is the correct one, has been ably set out by the Supreme Court of Mississippi in American Fire Ins. Co. v. State (May 24, 1897), 22 South. 99; by the Supreme Court of Pennsylvania in Com. v. Bartilson, 85 Pa. 187; by the Supreme Court of Illinois in Ochs v. People, 124 Ill. 429, 16 N. E. 662; by Judge Speer in United States v. Greene et al. (D. C.) 115 Fed. 343; by the Supreme Court of New York in People v. Mather, 21 Am. Dec. 122-147, 4 Wend. (N. Y.) 259, and by other authorities.

It is well and fully settled that the commission of an overt act is, per se, a renewal of the conspiracy. Bishop's New Cr. Proc. vol. 2, § 206, and vol. 1, § 61; A. & E. Enc. Law (2d Ed.) vol. 6, verbo "Conspiracy," p. 844, text and notes; American Fire Ins. Co. v. State (Sup. Ct. Miss., May 24, 1897) 22 South., at pages 102 and 103; Com. v. Bartilson, 85 Pa. 487-489; People v. Mather, supra, and other cases. However, I did not so charge the jury, although I would have been entirely justified in so doing. I charged, favorably to the defendants, that the jury had to find that the conspiracy existed and was in operation within three years, and that then they had further to find that an overt act to effect the object of the conspiracy had also been committed within the three years.

It is settled that the jury need not have found that the inception of the conspiracy took place within the three years. They had the right to go back to its origin for the purpose of determining whether it was continued or renewed and existed and was in operation within the three years. American Fire Ins. Co. v. State, supra; McKee v. State, 111 Ind., at page 382, 12 N. E., at page 512; Judge Speer in United States v. Greene et al. (D. C.) 115 Fed. 343, and other cases. The doctrine as to the point under consideration, which, in my judgment, is the correct one, is set out fully in the text of Am. & Eng. Enc. of Law (2d Ed.) verbis "Limitation of Actions," vol. 19, at page 165. In footnotes on that page, it is made to appear that the doctrine of the text is not in accordance with the decision of Judge Bunn (United States v. McCord et al. [D. C.] 72 Fed. 159), and the decision of Judge Deady (United States v. Owen et al. [D. C.] 32 Fed. 534), already referred to by me. Those two cases are the only ones cited in opposition to the text on the question of limitation. It should be noticed that while in one of the same notes, the case of Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545, is cited, that citation is evidently meant to show that under Rev. St. § 5440, an overt act is required, and that the same is not part of the offense. Dealy v. United States does not refer in any way to the question of limitation involved in this cause.

B. Defrauding the United States. That the indictment alleges and the proof shows a conspiracy to defraud the United States seems to me to be obvious. The indictment charges that defendants "unlawfully, knowingly, willfully, and feloniously" conspired to defraud the United

States out of certain certificates of location, otherwise known as land scrip, and of the title and possession of public lands of the United States, upon which said scrip could by law be located. The indictment further avers that the scrip when issued would be and was the property of certain persons named. The indictment further avers the obtaining of the scrip by the defendants, the sale of it by them, and their appropriation of the proceeds. It is further averred that subsequently public lands were located under the scrip. It was contended that the indictment sets out a scheme to defraud the persons named as being the lawful owners of the scrip, and not a scheme to defraud the United States. But it is evident to me that the result of the conspiracy was to defraud both the United States and the rightful owners of the scrip, and the fact that other persons besides the United States were to be defrauded cannot, of course, benefit the defendants. Even if it were true that to sustain the indictment in this case it was requisite to show that the carrying out of the conspiracy was to cause pecuniary loss to the United States, I am satisfied the proof established that fact. Where scrip in satisfaction of a confirmed private land claim is obtained from the United States, unlawfully, by fraud and artifice, and land is located under the scrip, and the lawful owner has been guilty of no laches or other fault, I am clearly of opinion that it is the duty of the United States, although they may not be coercible, to indemnify the lawful owner. By confirming a private land claim, the United States solemnly acknowledge their obligation to the claimant. No one doubts that a debtor is not liberated by payment to one who has falsely and fraudulently, and without any laches or other fault of the lawful creditor, imposed upon and deceived the debtor by representing himself to be the lawful creditor. The United States fully recognize their obligation to make the rightful claimant whole under such circumstances. They have made to that effect a rule or law for themselves. I so understand from reading an official letter on file in the United States General Land Office, of date May 31, 1904, from Hon. W. A. Richards, Commissioner of the United States General Land Office, to the Honorable Secretary of the Interior, and the approval on file in the same office, under date of June 11, 1904, by the latter official, of the action suggested by the former. New scrip was issued to Miss Fletcher for that portion of the scrip which she had been unable to recover in the cases of Fletcher et al. v. McArthur et al. (Sixth Circuit) 68 Fed. 65, 15 C. C. A. 244; same court, 117 Fed. 393, 54 C. C. A. 567. The action of the Land Department was based on the following authorities: Secretary Stuart's decision; Lester's Land Laws, vol. 1, p. 612, Nos. 621, 622; Opinion of Hon. R. B. Taney, Attorney General, 2 Op. Atty. Gen. p. 501; Opinion of Attorney General John Nelson, 4 Op. Atty. Gen. p. 298; Opinion of Attorney General Reverdy Johnson, 5 Op. Atty. Gen. p. 183; Opinion of Attorney General Cushing, 8 Op. Atty. Gen. p. 377; Case of Charles D. Mousso, 22 Land Dec. Dep. Int. 42.

The case of Antonio Vaca, 4 Land Dec. Dep. Int. 13, in which it had been held that the Land Department was functus officio after scrip had been issued in satisfaction of a private land claim, and could

not issue new scrip although the scrip issued was fraudulently obtained, was expressly disapproved in the official communications just mentioned, with the statement that the Antonio Vaca decision has not been followed by the Land Department.

It may be of interest to note that in the case of Grevemberg v. Bradford (one of the defendants in this cause), 44 La. Ann., at page 403, 10 South., at page 186, the contention was made on behalf of the defendant, Bradford, that even if the sale of the scrip which he had purchased was void for reasons similar to those averred in this cause, yet as he (the defendant, Bradford) had purchased the scrip in good faith, he could not be deprived of the land which he had located under it, and that the claimant had a remedy against the United States, as if no scrip had issued; citing authorities, some of which are cited by the Commissioner of the General Land Office in his said letter of May 31, 1904. It should be noticed that in the Fletcher Case, 117 Fed., at pages 395 and 396, 54 C. C. A. 567, the land itself was not awarded to the claimant, because the purchasers of the scrip under which they located the land were in good faith. Miss Fletcher was only awarded the value of the scrip. And in the official letter of date May 31, 1904, above referred to, the Commissioner of the General Land Office advised the Secretary of the Interior that, even if the statute of limitations had not run, the United States should not sue to annul the patents issued on the scrip, "for the reason that the scrip was bought by persons upon representations made by officials of the government that it had been properly issued and delivered."

It is thus made plain beyond question how the United States may be and are defrauded of their land by such a scheme as that set out in the indictment. But while, under the proof, the question does not arise in this ase, it is beyond question, in my opinion, that to constitute a conspiracy to defraud the United States under Rev. St. § 5440, it is entirely unnecessary to either allege or prove a purpose to defraud the United States of a thing of pecuniary value. The confusion as to the contention made that to constitute a conspiracy to defraud, under Rev. St. § 5440, there must be a purpose of defrauding the United States of pecuniary value, arises from the failure to distinguish between the purpose of statutes intended to punish cheats and frauds by private persons committed against other private persons, and the purpose of Rev. St. § 5440, which is intended to punish frauds against the sovereign. So far as my knowledge goes, all the statutes of the former class, both in this country and in England, provide, either in express terms or by clear intendment, that the cheating or defrauding must be of a thing of value. Such is the entire extent to which those statutes go, and, of course, in prosecutions under them, it is essential to allege and prove that the purpose of the defendants was to defraud others of things of value. But no such restriction is found in Rev. St. § 5440, either in terms or by intendment. It uses the broadest possible language. It punishes all who conspire to defraud the United States "in any manner and for any purpose." It is certainly just as important that the government should not be defrauded with regard to its operations, even if no pecuniary value is involved,

as that it should not be defrauded of its property. In fact, I believe that it is far more important that the government should be protected against the former class of frauds, and it would be astonishing, indeed, if Congress had failed to afford protection against such frauds.

The matter is so fully and ably discussed in the unanimous decision of the Circuit Court of Appeals for the First Circuit in the case of Curley v. United States, 130 Fed. 1, 64 C. C. A. 369 (a conspiracy to defraud in a civil service examination), that I deem it unnecessary to attempt to deal further with the matter. Specially notice McGregor. v. United States (Fourth Circuit) 134 Fed., at page 195, 69 C. C. A. 477, and cases there cited.

Although I have stated herein my opinion that the United States may be defrauded even when no pecuniary value is involved, it should be specially noted that, under the facts of this cause, the court did not go into that question with the jury. It should also be noted that the court granted without modification special instruction No. 11 concerning conspiracy, etc., requested on behalf of defendant Bradford, but applying by its language to both defendants.

While the following matters of law may have but little bearing on this cause, as an effectual and successful conspiracy was shown, they may still have some value in the general consideration of the cause. In prosecutions under Rev. St. § 5440, it need not be averred or shown that the conspiracy was successful. Gantt v. United States (Fifth Circuit) 108 Fed. 61, 47 C. C. A. 210. It is not necessary to show that the conspirators received pecuniary advantage from the conspiracy. United States v. Newton (D. C.) 52 Fed. 275; United States v. Allen, Fed. Cas. No. 14,432.

C. Averment in indictment as to defendants' knowledge of the facts in the successions. (1) The indictment charges, inter alia, that the defendants "unlawfully, knowingly, willfully, and feloniously" conspired to defraud the United States. (2) The indictment then further charges that the conspiracy was to be effected by the defendants "unlawfully and fraudulently" procuring and converting to their own use and benefit the certificates of location. (3) The indictment then further charges that the defendants, to effect the objects of the conspiracy, "unlawfully, knowingly, falsely, and fraudulently" applied in the name of one John C. McCants, "a person unlawfully interposed," by and in behalf of the defendants, "as the pretended administrator of the succession of said William Miller, deceased, to and received from the United States Surveyor General of the District of Louisiana" five of the certificates of location; that the defendants "falsely and fraudulently" caused the certificates of location "to be illegally sold at private sale by said pretended administrator, John C. McCants, a person unlawfully interposed for their benefit," and that the defendants received the proceeds, and converted them to their own use. It should now be specially noticed that there is no complaint, as I understand (but, if there be any, it is utterly without basis) as to the averments of intent, fraud, and falsity made concerning the matters just mentioned under Nos. 1, 2, and 3. The general charge shows that the defendants' rights were fully guarded in those

respects. I am perfectly clear that the indictment could have stopped there, and have been entirely sufficient and valid. It may be that it would even then have been redundant. What deficiency could have been suggested? It avers the conspiracy with redundancy as to intent, etc. It sets out the means which are averred to have been unlawful and fraudulent, and it may be said, in passing, that it was possibly unnecessary to set out the means. See Mr. Justice Woods in United States v. Dennee, 3 Woods, 47, Fed. Cas. No. 14,948, approved by the Fifth Circuit in Gantt v. U. S., 108 Fed. 63, 47 C. C. A. 210. See Bishop's New Crim. Proc. vol. 2, §§ 207, 208; United States v. Benson (Ninth Circuit) 70 Fed. 596, 17 C. C. A. 293; and it would seem Gantt v. U. S. (Fifth Circuit) 108 Fed., at page 63, 47 C. C. A. 210. The indictment sets out the overt acts, and avers that they were committed "falsely and fraudulently." The overt acts averred are: The application for the scrip; the sale of the scrip; the appropriation of the proceeds of the sale. The overt acts were no part of the offense. United States v. Britton, 108 U. S. 204, 2 Sup. Ct. 531, 27 L. Ed. 698; Gantt v. U. S., 108 Fed. 62, 47 C. C. A. 210, and other cases. While it is well settled (Gantt v. U. S., 108 Fed. 63, 47 C. C. A. 210, and other cases there cited) that the indictment need not show how or in what manner the overt act would tend to affect the object of the conspiracy, in this cause the overt acts are manifestly acts tending to and culminating in the successful carrying out of the conspiracy. Proof of any one of the overt acts, coupled with proof of the conspiracy, would have been sufficient. It is obvious, therefore, that the indictment would have been abundantly sufficient even if it had ended with the averments concerning the matters referred to above under Nos. 1, 2, and 3. It would have set out with more than legal sufficiency the conspiracy, the means, and the overt acts. However, if it could be conceived that it would thus have been insufficient, the defendants' remedy would have been by bill of particulars. Bishop, Crim. Pr. vol. 2, § 209.

But the prosecutor unnecessarily chose to go further, and by way of amplification and general averment he set out the true facts as to the successions, and averred that they were "well known" to the defendants; and he further set out that in the application for the administration the defendants "falsely and fraudulently" alleged and caused to be alleged the facts which were therein set out. It should again be specially noticed that, as I understand, the complaint is not as to the averment that the allegations with regard to the successions were falsely and fraudulently made by the defendants, but, if I have misconceived the full scope of the complaint, the general charge shows that defendants have no cause whatever to complain as to the averment of falsity and fraud just mentioned. My understanding is that the only cause of complaint as to this whole matter is that the court refused to charge, as requested by defendants, that the government must prove beyond a reasonable doubt that the defendants knew the true facts in the successions. The court, in its general charge, instructed the jury, inter alia:

"Now, it is for you [the jury] to say whether the government has or has not proven these allegations [jurisdictional allegations in the petitions for administration] to be false."

And:

"As to the knowledge of the defendants that the facts stated in the petitions in the successions of Miller, Taurus, and Smith were false, I charge you that it was not requisite that the government should have proven that the defendants actually knew that the facts were false. It is sufficient on that one point that the defendants made the allegations in the petitions in the successions of Miller, Taurus, and Smith in bad faith, and without regard as to whether they were true or not, and without having any knowledge whatever of their truth, or any reason to believe that they were true, and with the intent and for the purpose of defrauding the United States, as charged. On this point you will remember the testimony of the defendant Bradford. He said, as I remember (but this is a matter entirely for you), that he had a vague recollection that some one had told him that Miller lived in Washington parish, and possibly he testified that he had some vague information about Smith."

In Cooper v. Schlesinger, 111 U. S. 148, 4 Sup. Ct. 360, 28 L. Ed. 382, the Supreme Court, through Mr. Justice Blatchford, said:

"The jury were properly instructed that * * * a statement recklessly made, without knowledge of its truth, was a false statement knowingly made, within the settled rule."

This language was used in approving the charge of the trial judge, in which he had said:

"It is not necessary to constitute a fraud that a man who makes a false statement should know precisely that it is false. It is enough if it be false, and if it be made recklessly, and without an honest belief in its truth, or without reasonable ground for believing it to be true, and be made deliberately, and in such a way as to give the person to whom it is made reasonable ground for supposing that it was meant to be acted upon, and has been acted upon by him accordingly."

Statements not known to be true by the person making them are in law false. Lynch et al. v. Mercantile Trust Co., 18 Fed. 486. Specially see A. & E. Ency. Law (2d Ed.) verbis "Fraud and Deceit," vol. 14, pp. 95–97, 99, 101, text and notes. In law to "know" is to possess information. Bouvier's Law Dict. verbo "Knowingly." Hence, one who states a fact without possessing information does not know the fact, and makes a false statement. But the averment of knowledge with regard to the jurisdictional facts in the successions was entirely unnecessary; especially so, as the prosecutor charged that the defendants had made the allegations "falsely and fraudulently." Averment of knowledge unnecessarily stated may be rejected as surplusage. Bouvier's Law Dic. verbo "Knowingly," and cases there stated. The indictment is perfectly good without it. If the jury found that the conspiracy itself, with all its ingredients of intent, fraud, etc., existed, and that after its formation the defendants had for the purpose of effecting the object of the conspiracy "unlawfully, knowingly, falsely, and fraudulenly" committed the overt acts, or any one of them, and, assuming that it was necessary to go further, if the jury had found that the jurisdictional facts were "falsely and fraudulently" averred by the defendants in the application for administration, the jury would

have been warranted in finding the defendants guilty. As a matter of defense, the defendants could have shown that they were in good faith in making the jurisdictional averments. But the court did not charge that the onus of proving good faith was on the defendants, though it is believed such a charge would have been lawful. The court virtually charged, favorably to the defendants, that the onus of proving bad faith, etc. (as stated in full in the general charge), was on the government. This was all that the defendants were entitled to. It was, as I believe, much more than they could claim.

The "Whisky Prosecutions" in this court, in or about the year 1876, attracted great attention throughout the country. There were very able counsel engaged for the prosecution and for the defense. Every point was carefully and exhaustively examined and contended for. The indictments were all, as I believe, on the same printed forms. I have examined one of those cases (United States v. Fehrenback et al., No. 513 of the U. S. Circuit Court, Eastern District of Louisiana) which went up on writ of error to Circuit Judge Woods, afterwards Mr. Justice Woods. See 2 Woods, 175, Fed. Cas. No. 15,083. The indictment in that case, which was closely scrutinized in both the trial and the appellate courts, first states the conspiracy to defraud the United States of internal revenue tax on a large quantity of spirits. The indictment then goes on to allege a number of overt acts, each one of which was the removal of a certain quantity of spirits upon which the tax had not been paid. No averment is to be found that the defendants knew that the tax had not been paid on the spirits alleged to have been removed. It is plain, therefore, that the government was not called upon to prove the actual knowledge of the defendants as to that matter, and it was left to the defendants to prove, if they could, as matter of defense, that they did not know that the tax had not been paid, or that they honestly believed it to have been paid. If the averment had been added that the defendants knew that the tax had not been paid, would the government have been held to prove actual knowledge? Clearly not. If an indictment for larceny of a horse, after charging that A. B. feloniously took, stole, and carried away a certain horse, the property of C. D., contained the further unnecessary averment, "He, the said A. B., well knowing that the said horse was the property of the said C. D.," would the prosecution have to prove, and be limited to proving, actual knowledge? Clearly not. It would suffice for the prosecution to prove that the defendant did not honestly believe that he was the owner. A. & E. Enc. Law (2d Ed.) verbo "Larceny," vol. 28, p. 525. In fact, the Supreme Court has said in a similar case that the matter of an honest mistake was one of defense. Stone v. U. S., 167 U. S., at page 189, 17 Sup. Ct., at page 782, 42 L. Ed. 127. This supposed case concerning larceny is stronger than the case at bar, for in larceny the fact that the thing stolen is the property of another is an element of the offense, whereas the matter under consideration involves only an averment of knowledge as to a matter which is no part of the offense.

Doubtless, the doctrine of surplusage does not apply, when the unnecessary allegation is as to the identity of the thing which is the object of the crime, as if in larceny the defendant is charged with stealing a black horse. In such a case, as a matter of fairness to the de-

fendant, the prosecution will be held to the proof of the unnecessary qualificative. But the matter in hand involves no possible question of unfairness or surprise to the defendants, and is governed by totally different considerations.

D. ` Collateral attack. There is no collateral attack on the appointment of the administrator by the state court, involved in this criminal cause. There was no judicial sale of the scrip, and it was conceded that the private sale of the scrip was null and void under the law of Louisiana. In fact, part of the argument to sustain the contention that the United States were not and could not be defrauded by the conspiracy was that the sale of the scrip was an absolute nullity, and that therefore no right of the United States was affected by it.

The question then, is, whether the appointment of the administrator was an insuperable bar to the prosecution by the United States of the fraud committed upon them. It may be said incidentally that it was shown that the appointment was made by the clerk and without proof. Strange indeed would it be if such action, denominated a judgment, had the effect of paralyzing the arm of the government when it seeks in this cause to vindicate its criminal laws. If, in a civil suit, a party seeks to attack collaterally the appointment of an administrator, he is told that his remedy is a direct attack in the court which made the appointment. But in this cause no remedy has been or could be suggested to the government. It has not been even pretended that the government would have had a standing in a civil suit in the court of Washington parish to ask the annulment of the appointment. The proposition means, therefore, that whenever a criminal fraud is committed on the United States, they are absolutely powerless to prosecute the offenders, if the fraud has been committed by means of a state court judgment. Such a proposition is self-refuting.

But I repeat that there is no collateral attack on the appointment of the administrator involved in this cause. A collateral attack on the appointment of an administrator in a civil suit has invariably for its object his removal, or the denial or disregard of his authority, or the recovery of some property or property right. The appointment of the administrator McCants—such as it is—has in no manner whatever been disturbed by this prosecution or its result. No property of any kind, no right whatever in or to property, has been or can be affected by any action in this cause. It is utterly immaterial to the government whether or not McCants continues indefinitely to be administrator. How, then, can it be said that there has been a collateral attack upon his appointment? But, conceding, arguendo, what is clearly untrue, viz., that a collateral attack was permitted in this cause, what then? In a criminal action, such an attack can be made under circumstances similar to those appearing in this cause. The sovereign who prosecutes, not for the purpose of disturbing the civil judgment or any civil right arising from it, but for the sole purpose of vindicating his criminal laws, cannot be debarred by a civil judgment obtained by the wrongdoer for the very purpose of committing the offense. No authority has been or can be produced to support the contrary. Mr. Wharton tells us (Criminal Evidence [9th Ed.] section 595):

"Whenever a party seeks to avail himself of a former judgment fraudulently obtained, the opposite party may show the fraud, and thus avoid the judgment. In criminal issues, this is settled law." Numerous cases cited.

The same distinguished author, in the same work (section 570a) says:

"Nor is the fact that an issue was determined in another trial between the defendant and a private suitor, or between the sovereign and another defendant, conclusive as to persons not parties to such issue. Thus, when parties are indicted for procuring a fraudulent divorce, the prosecution may go behind the record, and inquire into the merits; and, on an indictment for conspiring to falsely accuse an innocent man of crime, the prosecution can go behind the record of conviction, and show that the conviction was the result of fraud"—citing cases.

The same author, in same work '(section 570a) says:

"It is as much an' indictable offense to cheat by fraudulently obtaining a judgment as it is to cheat by fraudulently obtaining a bond."

Answering the contention that the sovereign in such a case should sue to annul the judgment in the court which rendered it, the same author, in the same work (section 570a) says:

"But the commonwealth of Massachusetts was not a party to the judgment alleged to have been fraudulent, and could not have been heard on a motion to open it. Judgments, as we will see, can be impeached collaterally for fraud."

The same author, in same work (section 595) says, in speaking of collateral attack, that an acquittal or conviction, fraudulently obtained, can be so attacked. As to prosecutions for procuring fraudulent marriages, see same author, same work (section 590a), and same author (Criminal Law [8th Ed.] vol. 2, § 1362). A person indicted for forging a will cannot set up the probate of the will as even prima facie a defense. Same author (Criminal Evidence [9th Ed.] § 597). See, as to the inadmissibility of civil judgments in criminal prosecutions, 1 Greenl. Ev. (15th Ed.) § 537; A. & E. Ency. Law (2d Ed.); Verbis "Res Judicata," vol. 24, pp. 831, 832. At the latter page it is said (note) that the civil judgment is inadmissible, even if there is mutuality of parties—citing Stone v. United States, 167 U. S. 178, 17 Sup. Ct. 778, 42 L. Ed. 127, and other cases. I deem a further citation of authorities on this point unnecessary.

Again, assuming that this were a civil action, in which a collateral attack on the appointment of the administrator was actually attempted, under the circumstances set forth in this cause as to the successions, I find that the attack would unquestionably be allowable as to the Miller succession, and it would seem such an attack could also be made concerning the Taurus succession. Death; an existing succession (that is to say, an estate not previously administered and finally wound up by a competent court); inhabitancy or citizenship of the state; property within the state; and, semble, in Louisiana, debts—are fundamental facts, some of which, at least, must co-exist before probate power can validly be exercised. What doubt could possibly exist that the attempt to reopen the Miller succession in Washington parish in 1898, more than half a century after his estate had been fully

and finally wound up in Cincinnati in a competent court, after his estate had been wholly merged into the ownership of his heirs, and after all his debts had long since been paid or extinguished, was an utter and absolute nullity? No authorities can be needed as to such a question. Still, see Garrett v. Boeing (Sixth Circuit, Judges Taft, Lurton, and Severens), 68 Fed., at page 60, where it is said:

"The question constantly remains, what are the matters relating to the [probate] jurisdiction, without the existence of which the court is without power to proceed? Doubtless, the person whose estate is to be administered must have deceased. There must be a succession—that is, an estate—subject to the laws of the state, and susceptible of administration in the courts appointed for that purpose, and the property to be administered must be of that succession, and the succession must not have been already judicially administered. In the latter case, it is no longer in the succession, but has passed finally into new ownership. Probably there are other things of like general character, the existence of which might defeat the jurisdiction," etc.

See, also, Fletcher et al. v. McArthur et al. (Sixth Circuit) 68 Fed. 65, 15 C. C. A. 224, and 117 Fed. 393, 54 C. C. A. 567.

After the settlement of an estate, "the probate jurisdiction determines, and can no more be revived. The mortuaria proceedings cannot be reopened." Chief Justice Bermudez, in Atkinson v. Rodney, 35 La. Ann. 314. A succession being closed, it can never be revived by administration. Cross on Successions, § 21, p. 15, and other cases and authorities.

Even if Miller's succession had not been finally settled half a century prior to the attempt to administer upon it in Washington parish, that attempt would have been an absolute nullity because Miller did not die an inhabitant or citizen of Louisiana, nor did he leave property situated or debts due in Louisiana. I am not aware that any state has attempted to deal with decedents' estates where the decedents were not inhabitants or citizens of the state, and where they did not leave property within the state. Louisiana has not attempted to do so. A state has control only over its inhabitants or citizens and the property within its borders. In Perry v. St. Joseph R. R., 29 Kan. 420, it was held that a probate court has no jurisdiction to issue letters of administration where the decedent was not an inhabitant or resident of the state, and left no estate in the state. As already stated, the probate laws of a state can affect only the inhabitants or citizens of that state or the property within its borders, and an appointment of an administrator where there is no property within the state, or where the decedent was not an inhabitant or citizen of the state, is an absolute nullity. See Mr. Justice Peckham in Bolton v. Schriever (N. Y.) 31 N. E. 1001, 18 L. R. A. 242; Brown on Jurisdiction, page 444, § 131b. See Judges Taft, Lurton, and Severens in Fletcher v. McArthur et al. (Sixth Circuit) 68 Fed. 65, 15 C. C. A. 224, and 117 Fed. 393, 54 C. C. A. 567, and other cases.

In every proceeding of a judicial nature there are one or more facts which are strictly jurisdictional, the existence of which is absolutely necessary, and without which the act of the court is a mere nullity. Noble v. Union River Logging R. R., 147 U. S., at page 173, 13 Sup. Ct., at page 273, 37 L. Ed. 123. Death of the person whose estate is

sought to be administered is such a fact. The fact that the person was not an inhabitant or citizen of the state, coupled with the further fact that he left no property in the state, absolutely deprives any probate court of a state from attempting an administration. Of course, it is well settled (though the jurisprudence of the Supreme Court of Louisiana has varied on the point) that where the fundamental jurisdictional facts really exist, and a secondary question arises as to which one of several probate courts in a state has the right to administer the estate by reason of some fact arising or existing within its territorial limits, then the finding of the court in favor of its jurisdiction on this secondary question is prima facie valid, and is not subject to collateral attack, however erroneous the finding may be. If erroneous, the decree is voidable but not void, and the nullity can be declared only by means of a direct attack in the court which made the finding. Such would seem to be the present jurisprudence of Louisiana, although formerly it was not, and collateral attacks were allowed based on the fact that the decedent died a resident of a parish in the state other than that in which his estate was administered. Miltenberger v. Knox, 21 La. Ann. 399; Succession of Williamson, 3 La. Ann. 261; Clemens v. Comfort, 26 La. Ann. 269, and other cases. But where, because of the lack·of the fundamental jurisdictional fact or facts, no court of probate in a state would have power to administer an estate, the situation is totally different, and the erroneous finding by a court of the fundamental jurisdictional fact or facts cannot confer jurisdiction, and the appointment of an administrator and all his acts are absolutely null and void, and can be attacked collaterally anywhere by any party in interest. The clear-cut and radical difference between the two classes of cases is well illustrated by two decisions of the Circuit Court of Appeals for the Sixth Circuit, rendered on the same day: Garrett v. Boeing, 68 Fed. 51, already cited, in which a collateral attack was not permitted. It was based, inter alia, on the fact that the decedent died domiciled in the parish of St. Mary, La., and not in the parish of Lafayette, La., where the probate proceedings·involved in the cause had taken place. But in the case of Fletcher et al. v. McArthur et al., 68 Fed. 65, 15 C. C. A. 224, already cited, the same court, on the same day, permitted a recovery by a collateral attack on probate proceedings carried on in a Louisiana court in the succession of one who had died a citizen of Mississippi. See, also, same court in 117 Fed. 393, 54 C. C. A. 567. Notice Simmons v. Saul, 138 U. S., specially at pages 441, 447, 448, 451 et seq., 11 Sup. Ct. 369, 34 L. Ed. 1054.

As to the Taurus succession, it would seem that in Louisiana a collateral attack could have been made on the pretended appointment of the administrator, had this been a civil case, because Maria Taurus left no debts. I am fully aware that there is authority in other states to the effect that the existence of debts is not a jurisdictional fact in probate matters. But in the case of Burton and Wife v. Brugier and Sheriff, 30 La. Ann. 478, the Supreme Court of Louisiana held that the appointment of an administrator when there are no debts is absolutely null, and a judicial sale at the instance of the administrator is an absolute nullity, and the purchaser at the sale and the sheriff are mere tres-

passers if they enter upon the property sold. This case was decided by Chief Justice Manning, and on rehearing by Mr. Justice Spenser, two of the ablest jurists who have sat on the bench of the state Supreme Court. Under the civil law doctrine, "le mort saisit le vif," set out in the Louisiana Civil Code (articles 940 et seq.), a succession in Louisiana is transmitted to the heir by the mere fact of the death of the de cujus and the operation of law. When there are no debts, there cannot be even a temporary suspension of the full operation of the legal transmission. The property becomes absolutely and without restriction the full property of the heir from the very instant of the death of the de cujus. The private land claim of Maria Taurus was confirmed to her in 1825. She was a widow in 1815, and had cultivated the land since a time anterior to the year 1800. The pretended appointment of McCants as administrator took place in 1898. The longest prescription applicable to any debts she might have left is 10 years. It is therefore certain that she could not in 1898 have had any existing debts. To summarize: (1) No collateral attack was made in this cause. (2) A collateral attack may be made in a criminal case when its purpose is to punish a crime committed by means of the decree, judgment, or record collaterally attacked. Especially is this true in such a case as this. No man can claim impunity for a criminal fraud committed on the United States because he committed the fraud by means of a false state court decree. (3) Even in a civil case the appointment of McCants as administrator could be attacked collaterally under the averments in the indictment of the facts set out as to the succession of Miller. His estate had been lawfully and finally settled in a competent court in Ohio more than half a century before the attempt made in Washington parish to administer upon his estate. He died an inhabitant of Ohio. He left no debts in Louisiana or elsewhere which could have been in existence in 1898.

As to the Taurus succession, it would seem that, under the law of Louisiana, the appointment of an administrator to her estate was void, because she left no debts.

NOTE.—As to the matter of the statute of limitations, it should be noticed that the sole point at issue on that branch of the case was whether, as regards the statute of limitations, a prosecution for conspiracy under Rev. St. § 5440, is maintainable if instituted within three years of the commission of the last or of any overt act. The prosecution in this cause was the first one instituted on the conspiracy involved. No question of double or multiple prosecution or punishment for the same offense was presented for decision. What was said by defendants' counsel in the matter was merely by way of argument, in an attempt to show that the court's conclusion would lead to erroneous results. Whether, because of the peculiar nature of the offense denounced by Rev. St. § 5440, separate punishment can be lawfully inflicted every time an overt act is committed on a renewal of the original conspiracy, when previously the conspirators have been convicted and punished with regard to one of the overt acts, is a matter which was not involved, and did not arise, and which therefore did not call for decision by the court.