**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Nicholas D'ANDREA, Jack Ware and
Nelson Harris,
Defendants-Appellants.**

**Nos. 77-1063, 77-1073 and 77-1087.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 31, 1978.

Decided Nov. 2, 1978.

Rehearing Denied Dec. 22, 1978.

Stephen C. Bower, Kentland, Ind., James A. Greco, Gary, Ind., Charles A. Bellows, Chicago, Ill., for defendants-appellants.

Carmen A. Piasecki, Asst. U. S. Atty., Hammond, Ind., for plaintiff-appellee.

Before SWYGERT, BAUER, Circuit Judges, and McMILLEN, District Judge.*

BAUER, Circuit Judge.

Jack Ware, Nicholas D'Andrea and Nelson Harris appeal from their convictions of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. We affirm the convictions of D'Andrea and Ware, and reverse the conviction of Harris.

---

* The Hon. Thomas R. McMillen, United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation.

1. 18 U.S.C. § 371 provides in relevant part: "If two or more persons conspire either to commit any offense against the United States,

### I.

As a first step toward resolving the issues presented in this appeal, we must briefly outline its factual setting. In 1964, Bishop Oscar Freeman, a minister of the Church of God in Christ, applied to the Federal Housing Authority for federal mortgage insurance on a low income housing project in Gary, Indiana. The processing of the application was delayed, however, by Freeman's inability to secure a general contractor with sufficient bonding to qualify for federal insurance. Finally, in 1969, Freeman met Nicholas D'Andrea, a New Jersey contractor and bondsman who agreed to supervise the effort to obtain the needed FHA approval. To this end, D'Andrea organized a new corporation—H. Rupert and Company—to serve as general contractor on the project, and enlisted George Vlatas, a Philadelphia engineer, to draw up the necessary architectural plans. In addition, D'Andrea hired Nelson Harris, a local architect, to revise the original specifications, and named Jack Ware to serve as construction superintendent.

With Freeman as its sponsor, Harris as its architect, and H. Rupert and Company as its general contractor, the housing project was finally approved by the FHA for federal mortgage insurance in April of 1970. Construction began that same year and continued until the project's demise in June of 1971. Following a government investigation, a federal grand jury returned an indictment charging Ware, D'Andrea, Harris and six others with conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[1]

### II.

Before turning to the specific arguments raised in this appeal, we must first examine the essential nature of the alleged fraud that was perpetrated on the United States

or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

**1354**

in this case. This is especially important in view of the appellants' claim that the Government was not defrauded since it suffered no pecuniary loss through the misrepresentations that allegedly were made to the FHA. In particular, the appellants argue that the collapse of the Bishop Freeman Housing Project was the direct result, not of any misconduct on their part, but of unanticipated difficulties encountered in the course of construction—principally, cost overruns in masonry and excavation expenses. Indeed, according to the appellants, there was no evidence that any federally insured money was paid out for work that was not in fact done, or that any of the alleged conspirators were unjustly enriched through their participation in the project.

■ Significantly, however, the Supreme Court has made it clear that the language of 18 U.S.C. § 371 embraces much more than common law fraud:

"It has long been established that this statutory language is not confined to fraud as that term has been defined in the common law. It reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government.'"

*Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966) (citations omitted). Thus, to support a conviction of conspiracy to defraud the United States under 18 U.S.C. § 371 "[i]t is not necessary that the government . . . be subjected to property or pecuniary loss," *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924), nor is it necessary that the conspirators receive a pecuniary advantage, *United States v. Bradford,* 148 F. 413, 422 (E.D.La. 1905). Rather, all that is required is an agreement to "interfere with or obstruct one of [the United States'] lawful government functions by deceit, craft, or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States, supra,* 265 U.S. at 188, 44 S.Ct. at 512.

Such an interference with one of the lawful functions of government was precisely the object of the alleged conspiracy in this case. In particular, the indictment alleged that the named parties had entered into an agreement to make false statements to the FHA in an effort to obtain federally insured money for the Bishop Freeman Housing Project. Thus, according to the Government, if the conspirators had faithfully complied with FHA requirements—if they had not willfully misrepresented material items of fact—then the FHA would not have approved the insurance, nor would it have continued to participate in the ill-fated venture. This continuing involvement on the part of the FHA was by no means an inconsequential matter, for the federal government lost well over two million dollars through its commitment to insure the financing of the housing project. But the more important point, at least in this appeal, is that the essential nature of the alleged conspiracy is found in the agreement to interfere with the effective functioning of the FHA through willful misrepresentations of material facts.

With this in mind, we turn now to the appellants' claim that the evidence was insufficient to sustain their convictions. As to Ware and D'Andrea, it is our view that the evidence, when viewed in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941), was sufficient to support a finding of criminal conspiracy under 18 U.S.C. § 371.

In broad outline, the Government's evidence tended to show that the conspiracy proceeded in two steps, the first being the acquisition of federal insurance for mortgage funds to build the housing project through willful misrepresentations to the FHA. On this point, the Government's evidence established that D'Andrea submitted to the FHA a fictitious financial statement on H. Rupert and Company, the corporation that he had formed to serve as general contractor on the project. The statement not only concealed D'Andrea's financial involvement in the corporation, but it also claimed assets that were not, in fact, in the corporation's possession.

The Government's evidence also tended to show that, in violation of FHA requirements, D'Andrea, acting in concert with others, concealed a financial arrangement between the sponsor of the proposed hous-

ing project and its general contractor—that is, between the Freeman Church and H. Rupert and Company. More specifically, the evidence suggested that Rupert advanced a sum of $31,000 to Freeman, and this, in turn, enabled Freeman, as the project's sponsor, to meet certain financial requirements for FHA approval of the federal mortgage insurance.

Once the insured mortgage was thus secured and construction had begun, the conspiracy, according to the Government, entered its second stage: the acquisition of payments for construction costs through false statements submitted to the FHA. The evidence at trial established that the actual costs for excavation and masonry exceeded the estimates that had been submitted in obtaining FHA approval for federal insurance. This development promised to halt construction completely, for, in the case of cost overruns such as these, the FHA required the sponsor to deposit the additional funds before the work was done—funds that the Freeman Church simply did not have at hand. Thus, to obtain the money needed for construction costs, Ware and D'Andrea engaged in so-called "line juggling." [2] That is, according to the Government's evidence, the two men undertook to use anticipated surpluses from "line items" (for example, heating and ventilation) to cover the cost of overruns in other areas (principally, masonry and excavation expenses). This was achieved through false requisition orders which misrepresented the work that had been done in various phases of construction. With these false statements, Ware and D'Andrea were able to obtain the necessary FHA approval for continuing payments on the construction project.

When viewed in the light most favorable to the Government, the evidence on these overt acts permits a rational conclusion that Ware and D'Andrea were party to a working agreement to interfere with the effective functioning of the FHA by making false statements of material fact. For this reason, we find the evidence sufficient to sustain their convictions under 18 U.S.C. § 371.[3]

By contrast, however, we do not find the evidence sufficient to establish the requisite criminal intent to defraud on the part of Harris. In the proceedings below, the Government alleged that, as part of the effort to obtain the federally insured mortgage, Harris falsely certified that he had been paid a $30,039 architect's fee by the Freeman Church. It is true that Harris received only $5,000 of this sum, and that the remainder of the money was used to improve the financial condition of the Church.[4] But it seems clear from the record that the form which Harris certified

---

2. Neither Ware nor D'Andrea dispute that the "line juggling" took place. They argue, rather, that this practice did not cause any pecuniary loss to the Government since the "bottom line" remained the same. But, as we have noted, *supra* at p. 3, it is not necessary that the Government suffer an economic loss to be "defrauded" within the meaning of 18 U.S.C. § 371.

3. We note in this connection that we are wholly unpersuaded by Ware and D'Andrea's claims of withdrawal from the conspiracy prior to the indictable period. D'Andrea argues that he was not on the project site after February, 1971, and was therefore not a part of the conspiracy. Similarly, Ware claims that he was fired in April, 1971. It is well settled, however, that a mere cessation of activity is not enough to begin the running of the statute of limitations. *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1944). Rather, "there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators. And the burden of establishing withdrawal lies on the defendant." *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964). In this case, neither appellant has made a showing of such affirmative action. Indeed, there is evidence that both men were involved in the project after the dates of claimed withdrawal.

4. Harris was not present at the initial closing. His attorney endorsed the $30,039 check over to H. Rupert and Company, and then received a $5,000 check that was drawn on the Rupert account as payment for Harris's work. The attorney also received a receipt which stated that the condition of delivery of the $30,039 was that it would be used to pay the sums due Vlatas. In fact, however, the balance was diverted to the Freeman Church. See, *supra,* p. 5.

was viewed by all of the parties—including the FHA—as a receipt that had been prepared in advance so that the architect's fees could be paid at the initial closing. Its intended purpose, in other words, was simply to insure that any initial payments were for work that had actually been completed. This is particularly significant since the $5,000 that Harris received represented payment for the work that he actually had done in revising the plans of Vlatas, the original architect who was properly entitled to the balance. And, what is equally important, there is nothing in the record to suggest that Harris knew or should have known that the balance would not in fact be used to pay Vlatas, but rather, would be diverted by D'Andrea to the Church. We conclude, therefore, that even if Harris's statement was technically false, it cannot support an inference of criminal intent to defraud.

Nor do we find evidence of the requisite intent in Harris's allegedly false certification to the FHA that he had no "identity of interest" with H. Rupert and Company, the general contractor. To be sure, as the Government argues, Harris was engaged by Rupert to revise the architectural plans that had been prepared by Vlatas. But this occurred nearly a full year before the initial closing, and there is nothing to indicate that Harris was in Rupert's employ at the time of the closing.[5] We cannot agree, therefore, that his certification on this point gives rise to a reasonable inference of fraudulent intent. Similarly, we find no basis for such an inference in Harris's conduct during the actual construction of the project, for there is simply no evidence to indicate that he was in any way responsible for the false statements that were submitted to the FHA.[6] In sum, then, it is our conclusion that the evidence is insufficient to support the conviction of Nelson Harris under 18 U.S.C. § 371.

### III.

■ Ware and D'Andrea also argued for reversal on the grounds of alleged pre-trial errors. First, the appellants claim that they were deprived of their due process rights under the Fifth Amendment by reason of a pre-indictment delay. The Supreme Court has recognized that a pre-indictment delay can fall within the statute of limitations and yet be so prejudicial to the defendant's right to a fair trial as to violate the due process clause. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The Court has also indicated, however, that such a due process violation can be established only by proof of "actual prejudice to the conduct of the defense" and a "showing that the Government intentionally delayed to gain some tactical advantage." *Id.* at 325, 92 S.Ct. at 466.

In this case, the appellants argue that because of pre-indictment delay several individuals who had played a role in the construction project became unavailable as witnesses, while others were impaired in their ability to testify by faded memories. Significantly, however, the appellants do not identify any substantial way in which this unavailable testimony would have aided their cause. Their claims, therefore, are essentially conclusory assertions of prejudice, assertions which, in our view, are too speculative to satisfy the "showing of actual prejudice" required by *Marion.*

Moreover, even if "actual prejudice" were established, we are not persuaded that the Government "intentionally delayed the prosecution in order to gain a tactical advantage." The appellants appear to argue in this connection that an inference of intentional delay can be drawn from episodes of alleged prosecutorial misconduct—specifically, the use of subpoenas in securing pre-trial interviews of witnesses, the failure to

---

5. Assuming, *arguendo,* that an employment contract once existed Harris's obligation terminated when the FHA approved the architectural plans. It could not be said, then, that there was an "identity of interest" between D'Andrea (or Rupert) and Harris at the time of the initial closing, at least not as that phrase would be read by a layman.

6. Harris certified only that the requested money payments for the work performed were justified and that the construction was properly done. There was, in other words, nothing in his certifications that incorporated by reference the false statements made in the "line juggling" scheme.

provide the defendants with a bill of particulars and the failure to transcribe the grand jury testimony of an FBI agent. While we do not approve of these practices, we do not find any basis therein for concluding that the Government intentionally delayed the prosecution for tactical advantage. On the contrary, the evidence suggests that the delay was due in large measure to the untimely death of the FBI agent who had been in charge of the investigation. Moreover, "cases of fraud are difficult to develop" since "corroborative evidence is difficult to secure, and, of course, the participants in the fraud normally suppress evidence and impede the investigation." *United States v. Librach,* 520 F.2d 550, 555 (8th Cir. 1975). We therefore cannot agree that the pre-indictment delay in this case was so unreasonable and prejudicial as to warrant reversal.

▮ By the same token, we are not persuaded that these practices constituted an "abusive prosecution" which deprived the appellants of a fair trial. Again, we disapprove of all of these practices, but we cannot agree that, on the facts of this case, the appellants were prejudiced in any significant sense. First, the motion for a bill of particulars is addressed to the sound discretion of the trial court. And since, in our view, the indictment adequately informed the appellants of the charges against them, we cannot say that the lower court abused its discretion in denying the motion. Second, it is clear that Rule 6(d) of the Federal Rules of Criminal Procedure does not require the recording of grand jury testimony. See *United States v. McCord,* 509 F.2d 891, 894 (7th Cir. 1975). Moreover, the FBI agent whose grand jury testimony is here at issue was not a Government witness in its case-in-chief. It seems clear, therefore, that his testimony would not have been available to the defendants under the Jencks Act even if it had been transcribed. Finally, as to the use of subpoenas in securing the interviews of witnesses, it appears that this "tactic" was used by the Government in securing the interview of only one witness who testified at trial, and that witness was advised by his counsel that he was not required to appear.

▮ Similarly, we find no grounds for reversal in the appellants' claim that the proceedings below were tainted by prejudicial publicity. In support of the claim, the appellants cite a single article that appeared in the *Hammond Times* on November 3, 1976. This newspaper, however, had no general circulation in the district where the trial was held, and there is no basis for presuming that any of the jurors were exposed to it, particularly since the lower court admonished the jury daily not to read or listen to any outside accounts of the trial. Thus, we find no reason to believe that the appellants were in any way prejudiced by publicity either before or during the trial.

### IV.

▮ Finally, the appellants argue that reversal is warranted by the trial court's admission of allegedly prejudicial hearsay. The basis for the claim is found in the lower court's ruling that "hearsay" conversations are admissible if both parties to the conversation are witnesses at trial and thus available for cross-examination. Whatever the merits of this interpretation of the hearsay rule, we do not find in the challenged testimony any evidence that figured prominently in the Government's case against the appellants. Moreover, as the lower court noted, both parties to the alleged hearsay conversations were subject to cross-examination. Therefore, even if the conversations were properly excludable, we are not persuaded that their admission so prejudiced the appellants as to warrant reversal.

We have examined the appellants' other arguments and find them to be without merit.

Accordingly, the district court's judgment is affirmed in part, reversed in part, and the case is remanded with instructions to enter a judgment of acquittal as to Harris.

AFFIRMED IN PART, REVERSED IN PART, REMANDED WITH INSTRUCTIONS.

SWYGERT, Circuit Judge, dissenting.

The Government in this case alleged that nine defendants participated in a massive conspiracy to defraud the United States. It

is alleged that these nine individuals, who included such diverse people as a contractor, an attorney, a minister, a mortgage broker, an insurance man, an architect, an FHA official, and an office manager, each agreed to defraud the Government. This single conspiracy was to be accomplished in the following distinct ways: (a) by making false statements to acquire FHA insurance; (b) by making false statements to obtain payments during the progress of the construction; and (c) by soliciting and receiving kickbacks from materialmen and contractors.[1] Of the nine defendants,[2] one was severed from the case,[3] two were dismissed by the Government immediately before trial, one was dismissed by the court at the close of the Government's case, and two were acquitted by the jury. Three defendants were found guilty, Nelson Harris, Nicholas D'Andrea, and Jack Ware. Today we reverse Harris' conviction. Only two of the nine originally indicted defendants, D'Andrea and Ware, are left.

This case represents a archetype of prosecutorial abuse of the conspiracy statute, 18 U.S.C. § 371. It also reveals tactics used by the United States Attorney's Office for the Northern District of Indiana which, if not unethical, are highly questionable. I concur in the reversal of the conviction of Harris. I dissent from the affirmance of the convictions of D'Andrea and Ware.

### I

The history of the Bishop Freeman Project begins in 1964 when an elderly black clergyman, Bishop Oscar Freeman, attempted to organize a low cost housing project for blacks in Gary, Indiana. The sponsor of the development was the Freeman's Church of God in Christ, a not-for-profit organization. As an initial step, Bishop Freeman borrowed $40,000 against his house and allowed the church to pledge this money to show a sufficient financial status. (The FHA deemed this amount suf-

ficient to undertake a $2,500,000 project.) Difficulties were encountered from the beginning, the most basic of which was that interested general contractors (Bishop Freeman insisted that they be black) could not obtain sufficient bonding so as to qualify for an FHA insured project. Sometime in 1968 or 1969 Nicholas D'Andrea, a white contractor from New Jersey, entered the picture through the efforts of a black Chicago insurance agency that wished to provide the bonding. In order to handle the job as general contractor, D'Andrea created a corporation known as H. Rupert & Company.

The project was finally approved by the FHA for mortgage insurance in April 1970, and construction began in the summer of that year. In June 1971 the project was shut down, having been only partially completed. Because of the project's demise, the FHA had to pay claims totalling two million dollars. On April 8, 1976, almost five years after the project collapsed, an indictment was filed charging nine participants with conspiracy to defraud the United States.

### (a) Acquisition of FHA insurance

The Government contends that the conspiracy to defraud was accomplished in part by obtaining federal insurance for the Bishop Freeman Project through willful misrepresentation to the FHA. One such misrepresentation is purportedly found in a financial statement of Rupert & Company, prepared by a public accountant and submitted to the FHA. The evidence showed that while the statement claimed a checking account balance of $67,000, only $17,000 was on deposit that particular day. The corporation listed ownership of property which was actually owned either by the shareholders or by D'Andrea. Although the property was shown to exist, title had not been transferred to the corporation. The statement also indicated that D'Andrea had

---

1. The indictment also alleged that it was part of the conspiracy to conceal its existence.

2. The indictment also named one "unindicted coconspirator." He was never called to testify at trial.

3. This defendant was later acquitted, the district court granting a motion for a directed verdict at the end of the Government's case. The court found that there was no proof of any criminal intent to defraud on behalf of this defendant.

more than $1,700,000 worth of construction contracts in Pennsylvania, and that Rupert owned certain heavy machinery and equipment. These facts were shown to be accurate at trial.

It is difficult to see how the FHA was defrauded by this partially incorrect financial statement. No evidence was introduced that the FHA relied on this statement in approving the application.[4] In fact, since the financial report expressly stated that it was unaudited and that none of Rupert's assets and liabilities had been verified, the FHA could not reasonably have relied on the document.

The Government also asserts that the FHA was defrauded by misrepresentations made at the initial endorsement on April 14, 1970 when the FHA approved the project. A meeting was held at the FHA offices and was attended by representatives of the sponsor, contractor, mortgagee, and architect. Pursuant to FHA regulations the contractor and mortgagee each submitted a "certification" which provided that neither had any other contractual relationship with the sponsor.

As part of this aspect of its case the Government introduced a document entitled, "Escrow Agreement," signed by Alvin Zielitsky for the mortgagee McElvain Mortgage Company, Bishop Freeman for Freeman's Church of God, and Nicholas D'Andrea for Rupert & Company.[5] The agreement recited that because it was necessary for Bishop Freeman to pay McElvain approximately $47,000 and Bishop Freeman was able to advance only $16,000 of the sum required, Rupert, "desiring of seeing this project go forward", agreed to advance the sum of $31,387 on Freeman's behalf. (The

purpose of this advance to McElvain was to effect the purchase of Federal National Mortgage Association stock, as required by FHA regulations.) The escrow agreement recited that FNMA stock represented by the Rupert loan was retained by McElvain with power of attorney from Freeman to sell the stock. Upon its sale at the completion of the project, the proceeds were to be used to repay Rupert. Freeman was not required to reimburse Rupert for a loss from the sale of the stock.

The Government contends that the escrow agreement should have been disclosed at the initial endorsement meeting. Although the Government does not specifically argue that the certification by Rupert, signed by D'Andrea, was false in that D'Andrea did not disclose the existence of the escrow agreement at the April 14 meeting, this is the import of its contention. It is also the import of the majority opinion.

Although the certifications by D'Andrea and Zielitsky indicating that they had no other contractual relationship with the sponsor were incorrect (these two men could probably have been prosecuted for the substantive offense of submitting false documents to the FHA),[6] it is difficult to see how the Government was defrauded by the nondisclosure of the escrow agreement. The purpose of a certification is to ensure that the major participants in a housing project do not have financial control over the sponsor or an identity of interest with him because of financial obligations to each other. The escrow agreement did not create such control or an identity of interest; Bishop Freeman was not obligated in any way to repay all or part of the collateral to Rupert.[7] Nor was the FHA defrauded by

4. At the time this statement was filed, FHA regulations did not require a general contractor to file a financial statement.

5. The signature to the agreement for Rupert was actually Harry D'Ascenzo, which D'Andrea signed as an agent.

6. 18 U.S.C. § 1010, entitled "Federal Housing Administration Transactions," provides in part: Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit

shall be offered to or accepted by the Department of Housing and Urban Development for insurance, . . . or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the statement to be false, . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both.

7. The escrow agreement originally contained a clause requiring Bishop Freeman to pay Rupert for any loss sustained as a result of the sale of the stock. This requirement was deleted at the

the fact that Rupert paid for some of the FNMA stock. The purpose of such a stock purchase was apparently to ensure that the sponsor had capital reserved during the construction period. But as the mortgage company had complete control over the stock, and as Rupert was not entitled to a return of its advance until the project had been completed, the Government was fully protected. Because there was no guarantee that Rupert would get back any of its $31,-000 advance, Rupert's motive for signing the agreement can only be seen as its "desiring [to see] this project go forward." It does not demonstrate a criminal intent to defraud. In any event, there is a total absence of any evidence that D'Andrea and any other person, specifically Zielitsky and Freeman, either covertly or overtly agreed not to disclose the agreement. Zielitsky, a signatory to both the escrow agreement and a certification, was acquitted by the jury. Bishop Freeman, whose participation was known to the grand jury, was not indicted.

Another alleged misrepresentation, whereby the Government claims it was defrauded, pertained to the initial payout of architectural design fees. At the initial endorsement, a $30,000 check payable to Nelson Harris was endorsed by his nephew and transferred to Rupert at the direction of Robert Healey, D'Andrea's attorney. In return Rupert paid Harris $5,000 representing his architectural fees. The balance, $25,000, was intended as a payment to George Vlatas, a Philadelphia architect, who had drawn the original plans for the project. All of these facts were known to the FHA at the initial endorsement. What the FHA did not know was that instead of remitting the $25,000 to Vlatas, Rupert used the money to satisfy the escrow agreement it had entered into with Bishop Freeman. This, however, constituted a fraud on Vlatas, not on the FHA.

In sum, it is my view that none of these "misrepresentations" prior to FHA approval perpetrated any fraud on the Govern-

ment. (It should be noted that Jack Ware was not even connected with the project during this time.) The Government alleges, however, that the conspiracy continued after the FHA approved the project. Specifically, it alleges that the defendants filed false statements to obtain payments during the course of the construction.

(b) *Receipt of payments during construction*

Pursuant to FHA procedures Rupert in March 1970 filed with the FHA a Form 2328, "Contractor's Cost Breakdown." This form, which became part of the contract between the parties, listed the total contract price for the project as $2,530,996. It also identified each trade item, e. g., plumbing and roofing, and estimated what each item would cost. Because the subcontracts had not yet been awarded, the dollar figures listed on the 2328 were estimates only.[8] The 2328 was significant, however, in two respects. First, it listed and settled the total contract price. Second, although the contract with Rupert was on a "cost plus" basis, construction draws, whereby Rupert obtained funds to pay its subcontractors during construction, were based on the estimated figures in the 2328, not on the actual subcontract costs.

When Rupert entered into contracts with the subcontractors, the cost of the actual subcontracts often differed from the amount estimated on the 2328. While some of the subcontracts were lower than originally estimated, others were substantially higher. (For example, the actual masonry contract was $602,000 while the 2328 allowed only $414,000.) The discrepancies between the 2328 and the actual subcontracts posed a major problem for Rupert. Because the construction draws were to be based on the 2328, any difference between the two figures (for example, the $188,000 disparity in the masonry contract) had to be advanced by either Rupert or the sponsor, until such time as the project was complet-

---

suggestion of Zielitsky who stated that it would have violated FHA regulations.

**8.** At trial an FHA official, testifying as a Government witness, stated that generally sub-

contracts were not awarded at the time the 2328 was submitted.

ed.[9] This is money which neither Rupert nor Bishop Freeman had.[10]

To ensure that the subcontractors would be paid for all work actually performed, Jack Ware submitted on August 3, 1970 a revised Form 2328 with the FHA to reflect the actual subcontracts.[11] On August 13 the director of the Indianapolis FHA office rejected the revised form even though the total contract price of $2,530,996 was identical to the original 2328.[12] The director stated that construction draws would be advanced only on the basis of percentage of work completed as applied to the trade item dollar amounts indicated on the original 2328.

The Bishop Freeman Project encountered other difficulties besides the rejection of the revised 2328. When construction was about to begin, muck was discovered on the project site. Because foundation footings cannot be placed in muck, it had to be removed and the ground backfilled with sand. Earlier soil tests had not discovered the muck, therefore the original 2328 did not reflect the additional expense incurred by its removal.

Upon notice of the problem with the soil consistency, the FHA said that Rupert should file a change order with the FHA so that it would insure the additional expense incurred in the removal of the muck. The difficulty with this procedure, however, was that Bishop Freeman was required to deposit the money with the mortgage company before the work on the change order was done. As noted earlier, the Bishop did not have the funds available to cover the additional expenditures. Consequently no change order was ever processed with the FHA.[13]

The dilemma faced by Rupert was obvious: If Rupert abided by the original 2328 and worked within the scope of the amounts shown, the project would come to a standstill because of the lack of funds to pay the various subcontractors. In an attempt to resolve this dilemma in such a way to keep the project going, Ware engaged in line item juggling. To understand this bookkeeping scheme requires a brief review of the procedure used to obtain a construction draw.

To secure a periodic draw, the general contractor must prepare a contractor's statement (form 591) and submit it to the mortgage company. This statement lists the subcontractors who have performed work during the time specified, and lists the amounts they are to receive. The mortgage company in turn files an application of insurance with the FHA. The contractor must also prepare a contractor's requisition (form 2448) to be filed with the FHA which breaks down the proposed draw according to the line items contained in the original 2328. An FHA inspector must then certify the percentage of work completed. After the FHA reviews the submitted documents and approves the draw, the mortgage company releases its funds to be paid in accordance with the contractor's 591 statement.

In this case Rupert obtained eight draws over the course of the project from the mortgagee McElvain. Although the indictment alleged that all eight were false, the Government's own evidence at trial estab-

9. At the conclusion of the project the general contractor was required to substantiate his total cost and would receive that amount. For example, if the project was constructed for two million dollars instead of the projected two and one-half million dollars, the contractor would receive only two million. If, however, the carpentry subcontract was $600,000 and the general contractor received only $500,000 from the construction draws (the amount specified in the 2328), the general contractor would be entitled to an additional $100,000 so long as that additional money did not exceed the total contract price.

10. It is understandable that Bishop Freeman did not have the money as the FHA allowed this 2.5 million dollar project to proceed with a down payment of only $40,000.

11. On July 15, 1970 John Warrick, an FHA construction analyst, informed D'Andrea and Ware that they should submit an amended 2328 with actual supporting bids of subcontractors.

12. At trial FHA officials differed as to whether a 2328 form could be amended to reflect actual contract prices.

13. Although no change order was ever submitted with the FHA, its officials knew of the muck problem from the beginning of the project. It is somewhat surprising that they did nothing about it for almost a year.

lished that the first three were correct in every respect. The evidence disclosed, however, that discrepancies arose with the fourth draw. Specifically, the contractor's requisition (form 2448) prepared by Ware and sent to the FHA was different from the contractor's statement (form 591) sent to the mortgage company. A side-by-side comparison shows that although the bottom line totals of each form were the same, the line items differed.[14] Under the scheme Ware applied surpluses from one line item to shortages for another. (For example, surpluses from heat and ventilation were used to pay the masonry subcontractor.) Thus, payments to the subcontractors did not track the original 2328.[15] Although the Government presented no evidence that any money was paid for work not performed, it claims that it was defrauded by Ware's bookkeeping procedures.

It is again difficult to perceive how the Government was defrauded by Ware's scheme, particularly since the FHA had knowledge of the problems encountered by Rupert. Al Mysiliwy, as the FHA inspector on the project site, had the responsibility of checking plans and specifications and of reviewing the subcontracts and the work actually done. He also knew the contents of all documents submitted, including the original 2328 and the 2448. As such Mysiliwy knew from the beginning that the construction draws were not based on the 2328 but rather on the actual subcontracts. Mysiliwy received a judgment of acquittal at the close of the Government's case.

The FHA had knowledge even independent of its employee, Mysiliwy. When Ware submitted the revised 2328 on August 3, 1970 the FHA knew that some of the subcontracts were substantially higher than initially estimated. Furthermore, it received on September 16, 1970 a letter from Ware stating that the project was running $300,000 over the set figure of $2,530,996. Finally, on October 2, 1970, the director of the FHA office in Indianapolis noted that changes had been made on the project and that no change orders had been filed.

Regardless of the FHA's knowledge, Ware's actions did not constitute criminal intent to defraud. The record is devoid of any indication that the line item juggling was done for any other purpose than trying to keep the subcontractors paid and the project going. This does not amount to a criminal conspiracy, particularly since the FHA allowed this underfinanced project to begin and since it refused to make allowance for actual construction problems. The project did not fail because of any criminal act. It failed because Bishop Freeman did not have sufficient capital to cover the unexpected demucking and other encountered overruns.

### (c) *Kickbacks and material diversion*

The Government also contends that part of the conspiracy was for the participants to receive kickbacks and to divert materials and supplies from the project. The prosecution offered a virtual hodgepodge of assorted and unconnected events to support this aspect of its case. For example, evidence was admitted to show that Leon Coleman (one of the indicted coconspirators who was found not guilty by the jury) accepted and pocketed monies for deposit on future rentals from various persons. The record is absolutely barren of any evidence connecting this fraudulent activity with any other defendant or that the Government was defrauded by it.

Another example relates to work done on a house owned by the mayor of Gary. James Townes, a subcontractor on the Freeman project, built a swimming pool at the mayor's house while the project was underway. Some of the material used for the

---

14. While the 591 reflected the actual costs, the 2448 mirrored the estimates on the original 2328.

15. Approximately $235,000 was transferred among the line items. Miller Brothers received an additional $138,500 for masonry work; Towns Excavating received $41,700; North-

west Developers received $54,700. The reason for the masonry draw was the fact that the contract figure was higher. The overdraws on the earth work and site utilities were because of some demucking and a sewer line change. These overdraws were paid to the subcontractors for actual work done.

pool was improperly billed to Rupert. Testimony also showed that Ware, Townes, and Robert Echols, another supervisor of the project, did work on the mayor's house, generally after work or on Sundays, and that bricks which had been discarded from the Freeman project were used in the work. Significantly, keeping in mind that this is a conspiracy prosecution, there was no evidence that D'Andrea or the other indicted coconspirators had any knowledge of this activity or diversion of materials.

Without belaboring the point, however dishonest and irregular such conduct illumined by the foregoing examples may be, it is totally irrelevant to the charges of the indictment and calls to mind Mr. Justice Jackson's statement in *Krulewitch v. United States,* 336 U.S. 440, 454, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1954):

> A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.

## II

The record shows that work on the Bishop Freeman Project stopped on June 18, 1971 and was never resumed. On July 8, 1971 the Regional Director of HUD ordered that a field audit be made on the aborted project. The audit was conducted in August of that year by a HUD auditor. The result, known as the Gura Report, reads in part:

1. We found no evidence of misapplication of funds by the Mortgagor or the General Contractor.
2. Certifications as to actual costs made on Forms 2448 through May 31, 1971, were found to be correct . . . . . Subcontractor's records were adequate to support certifications.

Despite the Gura Report, it appears that the FBI began an investigation.[16] The date

when the investigation was completed is not in the record. However, it was not until April 8, 1975 that the grand jury indictment was filed.

The defendants filed pretrial motions for dismissal of the indictment on the ground that there had been a prejudicial preindictment delay. Without an evidentiary hearing on the motions, the trial court reserved ruling and did not rule on these motions during or at the close of the trial. Only after D'Andrea and Ware filed post-trial motions reasserting their preindictment delay issue, did the court rule. Again without an evidentiary hearing, the court denied the motions.

The district court's failure to afford a hearing on these motions in the face of a fifty-eight month delay in bringing this matter before the grand jury in itself is reversible error. The defendant Ware in his post-trial motion reasserting this defense listed eight items of prejudice. These included the claims that several material witnesses had died during the delay period, the destruction of Government records relating to the Gura Report, and the loss of the accurate recollection of events by many of the witnesses. The only explanation offered by the Government for the delay was reference to the death of the FBI agent in charge of the investigation during its progress. In their brief Government counsel argue that the claims of prejudice by Ware are insubstantial. This, of course, does not substitute for evidence or definitive findings by the trial court.

Regardless of the failure to conduct an evidentiary hearing, the record demonstrates that the Government offered insufficient reasons for the delay even by way of argument; the record also demonstrates that the claims of prejudice are largely unchallenged, again by way of argument. Accordingly, a delay of nearly five years—two months short of the applicable statute of limitations—was a denial of due process. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United*

---

**16.** The FBI began its investigation at least as early as October 28, 1970, when John Warrick, the first FHA inspector on the Bishop Freeman Project, made a detailed sworn statement to federal agents.

*States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

### III

Even if it could be said that the evidence is sufficient to support a jury's finding of guilt as to D'Andrea and Ware, there are a number of separate matters, including trial errors and prosecutorial misconduct, that compel reversal.

(a) *Selective recordation of grand jury testimony*

It has been the practice in the Northern District of Indiana not to record the grand jury testimony of federal agents. This practice is discriminatory and should not be condoned.

It has often been held that there is no duty to record grand jury testimony.[17] *See United States v. Aloisio,* 440 F.2d 705, 708 (7th Cir.), *cert. denied,* 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed.2d 51 (1971) and cases cited therein. That there is no duty to record grand jury proceedings at all does not mean that the United States Attorney has the freedom to select what testimony he desires recorded.

A defendant's right to inspect grand jury testimony either before trial (Rule 6(e)) or at trial (Jencks Act, 18 U.S.C. § 3500) is frustrated entirely if that testimony is not recorded. Therefore, the practice of not

recording the testimony of Government agents denies defendants the same opportunity available to the Government of impeaching the trial testimony of adverse witnesses whose grand jury testimony was selectively recorded.

When discretionary recordation is in the hands of the United States Attorney—one of the combatants—the practice is discriminatory and prejudicial. In the instant case the agent in charge of the FBI investigation testified at length before the grand jury.

In contrast to the recordation of the testimony of the non-Government witnesses, his testimony was not recorded. This is not even-handed justice.

Indefensible as the practice is, if this were the only alleged error, a reversal would perhaps not be justified. Yet it does add to the cumulative conclusion that prosecutorial abuse permeated this criminal proceeding.

(b) *Subpoenas*

It is, or at least has been, the practice in the Northern District of Indiana, followed in this case, for the United States Attorney's office to issue subpoenas to prospective witnesses, thereby securing their attendance for pretrial interview.[18] This practice is patently unauthorized and improper.

---

**17.** Most commentators have recommended mandatory transcription of all grand jury proceedings (excepting, of course, the deliberations). *See, e. g.,* ABA Standards, The Prosecution Function § 3.5(c) (Approved Draft 1971); 8 J. Moore, Federal Practice ¶ 6.02[2][d] (2d ed. 1977); 1 Wright, Federal Practice and Procedure § 103 (1969). The reasons for mandatory recordation were noted by Judge Pettine in *United States v. Gramolini,* 301 F.Supp. 39, 40–41 (D.R.I.1969):

> Against this background, I unequivocally reject the notion that recordation of grand jury proceedings interferes with the proper functioning of the grand jury. In no way does recordation inhibit the grand jury's investigation. True, recordation restrains certain prosecutorial practices which might, in its absence be used, but that is no reason not to record. Indeed, a sophisticated prosecutor must acknowledge that there develops between a grand jury and the prosecutor with whom the jury is closeted a rapport—a de-

> pendency relationship—which can easily be turned into an instrument of influence on grand jury deliberations. Recordation is the most effective restraint upon such potential abuses. Nor can it be claimed that the cost of recordation is prohibitive; in an electronic age, the cost of recordation must be categorized as miniscule. Indeed, even if a stenographic transcript be kept, the cost is clearly justified by the improved administration of criminal justice.

Commendably, the United States District Court for the Northern District of Illinois has adopted a local rule requiring mandatory recordation of all grand jury testimony. *See* Local Rule 1.04(c).

**18.** The subpoenas are issued on official forms and read as follows: "You are hereby commanded to appear in the United States District Court for the Northern District of Indiana at Room 312, State Street, in the City of Hammond, on the twelfth day of October, 1976, to testify in the above entitled cause. This sub-

As uniformly held by this court[19] and others,[20] United States Attorneys are not empowered under Rule 17 or otherwise to issue subpoenas requiring witnesses to report at the United States Attorney's office for pre-trial interviews. This practice has been labeled "unprofessional conduct" by the American Bar Association for it has the effect of commanding a witness to appear at the United States Attorney's office. ABA Standards, The Prosecution Function § 3.1(d) (Approved Draft 1971).

The Government concedes that the practice has the appearance of impropriety and admits that it has the effect of compelling the attendance of prosecutive witnesses. Yet it seeks to excuse its conduct by stating that it informs witnesses that they are not compelled to talk with the United States Attorney. This misses the mark, for the evil in the practice is not merely in deceiving an unsophisticated layman into feeling compelled to attend what turns out to be an interview rather than a court appearance. The danger also exists that the sham summons will put the recipient too much under the will of the United States Attorney. Having been summoned supposedly under official court process, the prospective witness may be placed in a compromising position conducive to involuntary cooperation with the Government. Moreover, such practice may discourage the witness from being interviewed by the defense.

Actually the practice is a surreptitious pretrial discovery technique. It is inherently coercive and it provides opportunities for subtle intimidation. Furthermore, because these subpoenas are issued under apparent court sanction, the practice constitutes a gross abuse of the judicial power of the federal courts.

### (c) Bill of particulars

Defendants D'Andrea, Ware, and Harris filed pretrial motions for a bill of particulars to identify the false statements allegedly made and to identify the contractors and materialmen who were allegedly solicited for favors. The motions were denied. This constituted reversible error because the denial severely prejudiced the defendants and exposed them to a mass of irrelevant evidence unrelated to the charges of the indictment.

The indictment covered a period of seven and one-half years charging nine persons with conspiracy to defraud the United States during the construction of a massive, two and one-half million dollar federally-insured housing project. The trial lasted twenty-one days and involved the testimony of forty-five prosecution witnesses and the introduction of over two hundred prosecution exhibits. The charging part of the indictment, however, was in general terms giving the defendants no inkling of the specific charges they had to meet; the indictment charged the defendants inter alia with submitting documents to the FHA which contained false information without identifying what information was false.[21]

poena is issued on application of the United States of America." The trial of this case did not start until October 27, 1976.

**19.** United States v. Standard Oil Company, 316 F.2d 884, 897 (7th Cir. 1963). See also United States v. Bowens, 318 F.2d 828, 829 (7th Cir. 1963).

**20.** See, e. g., In re Melvin, 546 F.2d 1, 5 (1st Cir. 1976); United States v. Keen, 509 F.2d 1273, 1274–75 (6th Cir. 1975); United States v. Hedge, 462 F.2d 220, 222–23 (5th Cir. 1972); Durbin v. United States, 94 U.S.App.D.C. 415, 417, 221 F.2d 520, 522 (1954).

**21.** This case is thus in many respects like tax evasion cases where a bill of particulars has been noted to be appropriate. For example, in United States v. Dolan, 113 F.Supp. 757, 759 (D.Conn.1953), Judge Hincks stated:

[I]f the case is such that the government relies for its proof of fraud solely upon one or more specific entries in the defendant's returns, it may properly be required to identify those entries so that the defendant in his preparation for trial may be in readiness to submit all possible evidence which he thinks will negate a showing of fraud founded on those entries, without expending the labor which would be necessary to present evidence as to entries which the government will not challenge. And so for reasonable assistance in the preparation of his defense as well as to prevent unfair surprise, I generally deem it to be a wise exercise of discretion in tax cases such as this to grant a motion requiring the government to identify

To meet the generalized charges of the indictment the defendants had to be prepared to rebut charges of fraud regarding each of the documents submitted to the FHA to obtain insurance for the mortgage funds on the project; they would also have to be prepared to rebut the charges that favors were solicited from each of the subcontractors and materialmen who worked on the project; and they needed to be prepared to rebut charges of fraud regarding each and every document and statement submitted to obtain payment during the course of construction. The unfairness of so burdening the defendants is readily apparent.

In justifying the denial Government counsel says in its brief:

Should the United States have been required through the vehicle of the Bill of Particulars to disclose evidentiary matters without adequate justification and precise need of the defendants for matters not otherwise available through discovery procedures, a Bill of Particulars would give the defendants an opportunity to "tailor defense evidence."

Such a statement is unworthy of a representative of the United States and no additional comment is required.

The Government also claims that to grant the bill would have restricted the scope of evidence it could offer at trial.[22] That is precisely the function of a bill of particulars. The Government was not so restricted here and, as a result, it introduced a morass of irrelevant and prejudicial evidence which the defendants were unprepared to meet. Examples of this are replete in the record. These are illustrative: Albert Stevens, a HUD representative, testified that the plans and specifications submitted to HUD and those certified by Harris did not correlate. George Bridgeforth, a building commissioner, testified over defense objections that a check for a building permit submitted by John Lewis, who preceded D'An-

drea as a prospective general contractor, was returned for insufficient funds. Bridgeforth also testified that the placing of a furnace in a stairwell, as specified in the plans, was dangerous and violated the Gary Building Code.

### (d) *Unindicted coconspirators*

After naming the nine indicted defendants as conspirators, the indictment alleged that these nine persons "did unlawfully, knowingly and willfully conspire, combine, confederate, and agree together with each other and other unindicted co-conspirators, and with diverse other persons whose names are to the Grand Jury unknown, to commit offenses against and to defraud the United States of America, in violation of Section 371, Title 18 of the United States Code."

After the indictment was filed the trial court entered a pretrial order which included the following provision: "The Government is now ordered to disclose in writing by name only any and all unindicted co-conspirators by September 7, 1976, to *each* defendant or his counsel." (emphasis in original.) Counsel for the Government asserts that this was done in compliance with requests made by the defendants. The record, however, contains no motion by defendants requesting such disclosure prior to the court's order. Only after the order was entered and in response to a Government motion for clarification did the defendants request that the unindicted coconspirators be named. As a result of the order six persons were designated prior to the trial by the United States Attorney.

Government counsel during oral argument conceded that the United States Attorney has no authority to amend an indictment by listing unindicted coconspirators but excused its doing so in this case by saying that the prosecutor was ordered to do so by the trial court.

---

every basic entry on a return the falsity of which it will seek to prove on trial.
*See United States v. Cafaro*, 26 F.R.D. 170 (S.D.N.Y.1960) (in prosecution for conspiring to obtain FHA insured financing, Government was required to identify what statements contained in the applications were false).

**22.** Government counsel apparently overlooks the fact that Rule 7 provides that a bill "may be amended at any time subject to such conditions as justice requires."

Regardless of the procedural posture of this issue, the United States Attorney has no authority to name unindicted coconspirators who are not identified in the indictment. Nor does the court have the power to order the United States Attorney to list such names prior to trial. By this device the Government's advantage in the enlarged use of the coconspirator hearsay rule is obvious. The indictment does not allege that the identities of the "other unindicted coconspirators" were unknown. It merely failed to name them.[23] To give the United States Attorney unbridled authority to name whom he wished as unindicted coconspirators was to make an unwarranted and impermissible amendment to an indictment. The pretrial order quoted above constituted reversible error.

(e) *Appeal*

Finally, note must be made of the brief filed by Government counsel in this case. Important facts are not supported by page citations to the record;[24] citations given do not support the factual statement. More disturbing is the fact that certain factual statements are simply not correct. For example, the brief states: "Harris certified that the project was 54% complete." This is a misstatement of the evidence as the record is clear that Harris did not make any representation as to the percentage of completion of construction. Rather the representation was made by Mysiliwy, an FHA inspector. Another example is the statement in the brief: "In this manner, the defendants were able to manipulate the disbursements assuring windfall profits to certain subcontractors . . . ." There is no evidence in the record that anyone received any windfall profits. The Government offered no evidence to show that monies were paid for work not actually performed. Such careless or reckless statements do not measure up to the professional standards that are expected by attorneys representing the Department of Justice.

I would reverse.

23. The indictment did name one unindicted coconspirator. Several courts have recently held that a grand jury does not have the power to name unindicted coconspirators. See *United States v. Chadwick*, 556 F.2d 450 (9th Cir. 1977) (*per curiam*); *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975); *Application of Jordan*, 439 F.Supp. 199 (S.D.W.Va.1977).

24. For example, the brief states without page citation: "D'Andrea and Harris also remained on the project until its demise in June 1971." One of D'Andrea's arguments on appeal was that he left the project earlier and therefore the statute of limitations had run against him.